# EXHIBIT 1

## LOAN AGREEMENT

THIS LOAN AGREEMENT ("**Agreement**") is made as of February 14, 2007, by and between Gemini Youngsville Crossing, LLC, a Delaware limited liability company ("**Borrower**"), and MERRILL LYNCH CAPITAL, a Division of Merrill Lynch Business Financial Services Inc., a Delaware corporation (collectively, with its successors and assigns, "**Lender**").

RECITALS

A.     Borrower is or on the Closing Date will be the owner in fee simple of land located at the Intersection of US Highway 1 and NC Highway 96 in the City of Youngsville, County of Franklin, State of North Carolina, commonly known as Youngsville Crossing and legally described on Exhibit A attached hereto (the "**Land**"). Pursuant to the terms and conditions of this Agreement, Borrower shall construct new improvements on the Land consisting of retail buildings containing in the aggregate approximately 91,658 net rentable square feet (the "**Project Rentable Square Footage**") and parking sufficient to meeting applicable zoning requirements.

B.     Borrower has applied to Lender for a loan in the amount of up to Seventeen Million Eight Hundred Twenty Five Thousand and 00/100 DOLLARS ($17,825,000.00) (the "**Loan**") for certain construction and development costs of the Project, and Lender is willing to make the Loan on the terms and conditions hereinafter set forth. The Loan is evidenced by (i) that certain Promissory Note (A Note) of even date herewith made by Borrower in the original principal amount of Fifteen Million Fourteen Thousand Four Hundred Eighty Six and 00/100 DOLLARS ($15,014,486.00) and payable to Lender (the "**A Note**"); and (ii) that certain Promissory Note (B Note) of even date herewith made by Borrower in the original principal amount of Two Million Eight Hundred Ten Thousand Five Hundred Fourteen and 00/100 DOLLARS ($2,810,514.00) and payable to Lender (the "**B Note**") (the A Note and the B Note and all amendments thereto and substitutions therefor are hereinafter referred to as the "**Note**"). The terms and provisions of the Note are hereby incorporated by reference, in this Agreement.

C.     Borrower's obligations under the Loan will be secured by, among other items, a first priority Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing of even date herewith (the "**Mortgage**") encumbering the Project, and granting Lender a first priority lien in the Project. This Agreement, the Note, the Mortgage, and any other documents evidencing or securing the Loan or executed in connection therewith, and any modifications, renewals and extensions thereof, are referred to herein collectively as the "**Loan Documents.**"

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, the parties hereto agree as follows:

## ARTICLE 1
## INCORPORATION OF RECITALS, EXHIBITS AND SCHEDULES

**1.1     Incorporation of Recitals.**

The foregoing preambles and all other recitals set forth herein are made a part hereof by this reference.

**1.2     Incorporation of Exhibits and Schedule.**

Exhibits A through M, the Limited Joinder and Schedule I to this Agreement, attached hereto are incorporated in this Agreement and expressly made a part hereof by this reference.

**1.3     Definitional Provisions.**

All terms defined in Schedule I of this Agreement or otherwise in this Agreement shall, unless otherwise defined therein, have the same meanings when used in the Note, Mortgage, any other Loan Documents, or any certificate or other document made or delivered pursuant hereto. The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement. The word "include(s)" when used in this Agreement and the other Loan Documents means "include(s), without limitation," and the word "including" means "including, but not limited to."

## ARTICLE 2
## LOAN AND LOAN DOCUMENTS

**2.1     Conditions Precedent to Initial Closing.**

Loan Documents. Borrower agrees that Lender's obligation to close the Loan is conditioned upon Borrower's delivery, performance and satisfaction, as applicable, all in Lender's sole discretion, of (i) all items set forth in that certain Loan Application accepted by Borrower on October 10, 2006 (the "**Loan Application**"), (ii) all items on that certain Closing Checklist issued with respect to such Loan Application, (iii) this Agreement and the other Loan Documents, (iv) a legal opinion for the benefit of Lender issued by counsel for Borrower, (v) a loan fee in the amount of $178,250.00 and (vi) such other documents, instruments or certificates as Lender and its counsel may reasonably require, including such documents as Lender deems necessary or appropriate to effectuate the terms and conditions of this Agreement and the other Loan Documents, and to comply with the laws of the State of Illinois and the State of North Carolina.

**2.2     Disbursements.**

(a)     Initial Funding Amount. Subject to the terms, provisions and conditions of this Agreement and the other Loan Documents, on the Closing Date, Borrower agrees to borrow from Lender and Lender shall disburse to Borrower from the proceeds of the Loan the sum of $3,200,967.00 (the "**Initial Funding Amount**").

(b)     Conditions Precedent to Future Disbursements. A portion of the Loan Amount proceeds in an amount equal to $13,624,033.00 (the "**Holdback**") shall be retained by Lender for the construction of the Improvements on the Project as or to be approved by Lender. The Holdback is allocated among the following categories in the following maximum stated amounts: (A) for capital improvements of the Project as or to be approved by the Lender (the "**Capital Improvements**"): $11,815,005.00, and (B) for improvements for tenant spaces at the Project (the "**Tenant Improvements**") as or to be approved by Lender and for leasing brokerage commissions in connection with leasing space at the Project: $1,809,028.00. No amounts held back for any such category may be used or distributed for costs and expenses of any other category without Lender's prior written consent, which may be withheld in Lender's sole discretion, except on completion of any category, any amount remaining may be reallocated to another category. Once the maximum stated amount for any category is disbursed, no further disbursements for that category will be made. On or before the Closing Date, Borrower shall submit to Lender, for approval by Lender and Lender's Consultant, a description of the Capital Improvements and the Tenant Improvements, including, with respect to the Capital Improvements, a schedule for completion ("**Construction Completion Schedule**") attached hereto as Exhibit C, a construction budget (the "**Construction Budget**") attached hereto as Exhibit B and a fully executed and complete owners statement ("**Owner's Statement**") attached hereto as Exhibit L. No portion of the Holdback shall be disbursed until Lender shall have received and approved: (i) a construction contract executed by Borrower and the Construction Contractor; (ii) a contractor's consent executed by the Construction Contractor; (iii) final Plans; (iv) all permits and approvals required for the construction of the Improvements; (v) subcontracts to the Construction Contract; (vi) a plan and cost review, and (vii) a complete list of all Governmental Approvals. Absent a default hereunder or under any of the other Loan Documents, Lender shall make disbursements of portions of the Holdback subject to the following conditions (except to the extent waived in writing by Lender and any such condition waived by Lender as to any particular disbursement may be re-imposed as a condition of subsequent disbursements):

(i)     Borrower shall have delivered to Lender a fully executed and complete application on AIA Form 703 covering the disbursement requested (sometimes referred to herein as the "**Application**") signed and submitted to Lender and Lender's Consultant, one time each month, covering costs incurred during the preceding month. Each Application shall be accompanied by (a) such invoices, contracts, bills, vouchers, change orders, and other statements and information as may be requested by Lender; and (b) a certificate or other satisfactory evidence that all prior disbursements of a portion of the Holdback have been used and applied for the purposes stated in prior Applications.

(ii)     All improvements to and including the stage represented in the current Application shall have been completed in substantial accordance with the Plans and reasonably acceptable to Lender and Lender's Consultant and, subject to Force Majeure, Borrower is meeting the dates set forth in the Construction Completion Schedule and is anticipated to complete construction of the Project on or before the Completion Date.

(iii)     Within a reasonable time after receipt of Application and required supplementary information, Lender's Consultant shall have reviewed each Application

3

submitted by Borrower and shall have certified, to Lender's satisfaction, that (a) such Application is approved for payment and that all work described in or covered by such Application has been performed in substantial accordance with the Plans, (b) all materials covered by the Application have been incorporated into the Improvements or adequately stored and insured on or off the Land, (c) the amount requested plus amounts previously disbursed under the Loan or Borrower's Equity Contribution do not, as a percentage of the total amount of funds available, exceed the percentage of completion of the Project as of the requisition date, and (d) the undisbursed Holdback is sufficient to complete the Project in accordance with the Plans prior to the Completion Date or, at Lender's option, Borrower shall either (A) invest or cause to be invested such shortfall in the construction of the Improvements or (B) deposit or cause to be deposited with Lender an amount of money sufficient to pay for all such costs and expenses in excess of the undisbursed Holdback.

(iv)    Borrower shall have furnished waivers of liens of the Construction Contractor and each Major Subcontractor for work performed or materials delivered through the period covered by the previous Application.

(v)    Lender shall have received, at Borrower's expense, an endorsement to the Title Policy insuring the priority of the Mortgage with respect to such disbursement and indicating that no intervening liens exist against the Project.

(vi)    Borrower shall deliver a foundation survey to Lender within sixty (60) days after the footings and foundation of the Improvements are in place. Such survey shall show the location of the foundations of the Improvements on the Land with relation to the boundary lines of the Land and all easements and set-back lines and shall be prepared by a registered engineer who shall certify that such foundation is in compliance with all required set-back or building restriction lines. At any time a survey is required from Borrower, as aforesaid, the Engineer shall certify on each such survey that the construction completed to date as shown on such survey disclosed no violations, encroachments, or variations of set-back or other restrictions other than those which Lender may waive in writing.

(vii)    Intentionally deleted.

(viii)    Borrower shall have paid, upon demand, any and all fees due Lender and any and all costs incurred by Lender up to the date of such disbursement.

(ix)    Borrower shall have delivered to Lender a fully executed and complete Owner's Statement attached hereto as Exhibit L.

(x)    Borrower shall have delivered to Lender a fully executed and complete disbursement requisition (the "**Disbursement Requisition**") attached hereto as Exhibit M.

Any Developer Fee must be identified on the Construction Budget and shall be paid as follows:

(i)     Fifty percent (50%) of the Developer Fee shall be paid in twelve (12) equal monthly installments commencing one month from the Closing Date; and

(ii)     Fifty percent (50%) of the Developer Fee shall be paid on a pro-rata basis upon Transfer of each Release Parcel, based upon the square footage of each Release Parcel as set forth in Exhibit D.

(c)     Final Construction Disbursement. The final construction disbursement made to Borrower, including all retainage (except for funds held by Lender pending completion of so called "punch list" items of work remaining, as identified by Borrower and the Construction Contractor and approved by Lender's Consultant) shall be made at such time as, in addition to the conditions precedent to disbursements set forth above, all of the following conditions are satisfactorily met:

(i)     Satisfactory completion of the Project in substantial accordance with the Plans and any modifications of the Plans approved by Lender (where approval is required), including completion of all site work and public improvements, as evidenced by final governmental or quasi-governmental inspections and approvals thereof and the issuance of a "Certificate of Substantial Completion" from the Architect to the Borrower.

(ii)     Written evidence that the water, gas (if required by the Plans), and storm and sanitary sewer lines are connected to the public systems and are in operating condition.

(iii)     Satisfactory evidence of compliance with all Laws, ordinances, rules, regulations, and codes, and delivery to Lender of a copy of the permanent certificate or final certificates of occupancy and applicable governmental or quasi-governmental certificates of completion for the Project (or other evidence satisfactory to Lender that the Project can be lawfully occupied), issued by the Governmental Authority having jurisdiction over the Land.

(iv)     Delivery to Lender of an as-built survey showing the location as built, of the Improvements, parking areas and abutting streets, and the location of utilities and other easements, encroachments, and building setback lines, if any.

(v)     A certification by Lender's Consultant that the construction of the Project is free of defects and damages and has been completed in a good and workmanlike manner and in substantial accordance with the Plans approved by Lender.

(vi)     Borrower shall have completed the Improvements on or before the Completion Date.

(d)     Procedures for Disbursements. Disbursement of the Holdback shall be made in accordance with the following procedures and requirements:

(i)     Application for Payment. Notwithstanding anything to the contrary set forth herein, other than the Initial Funding Amount, all disbursements to be made

pursuant to this Section 2.2, shall be made as a single disbursement by Lender not more than once in any calendar month pursuant to a single monthly disbursement request from Borrower. Each disbursement shall be in an amount not less than $25,000 (other than the last disbursement, if the remaining undisbursed amount is less than $25,000) and shall be subject to a $200.00 disbursement-processing fee payable to Lender. Each Application submitted shall constitute a representation by Borrower that the work and materials for which payment is requested have been physically incorporated into the construction or delivered to the Project site or storage area free of any security interest, liens, or encumbrances other than those created as security for the Loan, and that, based on certifications from the Project Architect or engineer, the work and materials covered by the Application conform to the Plans and all Laws, statutes, ordinances, rules, and regulations. The approval of Applications by Lender shall not constitute an acceptance of the work and materials nor be binding upon Lender except to the extent that the facts actually are as represented when approved. The aggregate of all disbursements made by Lender at any time shall not exceed the value of the work done and the materials physically incorporated into the construction or delivered to the Project site or stored off-site. Lender agrees to use reasonable efforts to make disbursements within fifteen (15) days after Lender's receipt of an Application, however, Lender shall have no liability to Borrower or any other entity or individual if it fails to make any disbursement within said time frame.

      (ii)    Lender's Inspection. If, for any reason, Lender deems it necessary to cause the construction of the Project to be examined by its representatives or Lender's Consultant prior to making any disbursement (including, without limitation, any disbursement relating to the stored materials as more particularly set forth in Section 2.2(iii) hereof), it shall have a reasonable time to do so or to cause Lender's Consultant to do so, and Lender shall not be required to make any disbursement until such examination has been made and is satisfactory to Lender. If, as a result of such examination, Lender finds some portion of the work unsatisfactory, Lender will fund the portion of the disbursement that is satisfactory to Lender and Lender's Consultant and shall provide for Borrower a copy of the report of Lender's Consultant relating to such examination. Any such inspection by Lender or its representatives shall be for the sole benefit of Lender and for ensuring that the construction of the Project is proceeding satisfactorily and that the Loan is secure. In no event shall such inspection be construed as participation by Lender in the construction of the Project, as approval by Lender of the quality of the construction, or as a warranty that the Project complies with local building codes or the Plans.

      (iii)    Stored Materials. All materials for which a requisition has been made shall have been either (i) incorporated into the Improvements or (ii) stored in accordance with the following requirements:

      (1)    All stored materials, whether stored at the Project or off-site, must be, in Lender's reasonable opinion, adequately stored, safeguarded and insured, and Borrower shall cause Lender to be added as an additional insured to

any insurance policies it or its general contractor may obtain in accordance herewith.

(2)        Borrower shall provide to Lender, with each requisition submitted wholly or in part for materials to be stored, whether stored at the Project or off-site, a copy of the relevant bill of sale and evidence of insurance which shall show Lender as an additional insured.

(3)        To the extent the total value of all materials stored off-site would exceed One Hundred Thousand and 00/100 Dollars ($100,000.00), such excess materials shall be stored in a bonded warehouse (except for lumber, which may be stored in an insured reload center).

(4)        The total value of all stored materials, whether stored at the Project or off-site, shall not exceed five percent (5%) of the portion of the Holdback allocated to "hard costs" at any one time. For purposes of determining compliance with the limitation set forth in the foregoing clause (3) above and in this clause (4), stored materials shall not be deemed to include any materials reflected as "stored materials" on any particular Application that are actually incorporated into the Project as fixtures prior to the submission of the next succeeding Application hereunder.

(5)        As a condition to any disbursement of Loan proceeds for materials stored outside the Youngsville, North Carolina, metropolitan area, Lender shall be entitled to require that the Lender's Consultant inspect and approve such materials at the site where they are stored, and Borrower shall pay all costs and fees of the Lender's Consultant, including travel costs, incurred in connection therewith.

(iv)    Retainage. Provided all other conditions to disburse amounts in the Holdback have been satisfied with respect to an Application, Lender shall disburse to Borrower, in accordance with the Construction Budget, (i) ninety percent (90%) of the amounts due to contractors, subcontractors and laborers with respect to the construction of the Project as evidenced by and based on the invoices, contracts, bills, vouchers, change orders, and other information supplied to and approved by Lender, and (ii) such other amounts as are approved by Lender. Requests for payment made by the Construction Contractor for "general conditions" expenses, the Construction Contractor's fee, permits and direct material purchases (i.e., lumber, millwork, windows, appliances, doors) shall not be subject to retainage; however, request for payment made by the Construction Contractor for any other work shall be subject to the foregoing retainage. Lender acknowledges that the Construction Contract contemplates the possibility that individual trade contractors may be paid their retainage for their respective portions of the work. Lender will release such retainage, provided Lender and Lender's Consultant concur that such trade contractor's work has been fully and finally completed. Otherwise, provided all other conditions to disburse amounts in the Holdback have been satisfied

with respect to an Application Lender will release the balance of the retainage in connection with the final construction disbursement.

(v) Borrower's Equity. Borrower shall expend in connection with the Project on project costs approved by Lender an amount equal to Nine Hundred Forty Three Thousand One Hundred Eight and 00/100 Dollars ($943,108.00), of which not less than One Hundred Eighty Eight Thousand Six Hundred Twenty One and 00/100 Dollars ($188,621.00) shall have been contributed in cash by the Principals and the remainder may be contributed directly or indirectly by entities controlled by the Principals ("**Borrower's Equity Contribution**"), which Borrower's Equity Contribution shall be contributed and utilized for costs and expenses to be incurred in owning the Project and completing the construction of the Project approved by Lender in accordance with the approved Construction Budget. All of Borrower's Equity Contribution shall be expended, and proof thereof shall be provided to Lender, prior to the Lenders' disbursing any funds from the Holdback. The Principals shall have contributed, in the aggregate, directly, not less than twenty percent (20%) of the Borrower's Equity Contribution, and the balance of the Borrower's Equity Contribution may be contributed directly or indirectly through entities controlled by the Principals.

(vi) Use of Proceeds. Borrower will use the proceeds of the Loan solely for the costs described in the Construction Budget and will promptly, upon receipt of a disbursement, pay the expenses for which the disbursement was requested in the Application and related documents. Borrower will receive the disbursements to be made hereunder and will hold the right to receive the same as a trust fund for the purposes of paying the costs of the Project. The funds disbursed shall not be subject to any attachment against Borrower or any assignment by operation of law or otherwise.

(vii) Damage to Project. If the Land and Improvements, or either of them, suffer material damage or destruction, Lender may, without liability, refuse to make any disbursements of funds until satisfactory arrangements for restoration or replacement of the Land and Improvements have been made.

(viii) Discretionary Disbursements by Lender. Lender may, in its sole discretion, make a disbursement from the Holdback in order to satisfy the conditions hereof if an Event of Default shall occur hereunder or under the Loan Documents, and may disburse funds directly to contractors and subcontractors on Borrower's account, and amounts so applied shall be part of the obligation evidenced by the Note and shall be secured by the Mortgage. After the occurrence of an Event of Default, at its option, Lender may (i) pay any part, or the whole, of any payment authorized pursuant to this Agreement before it becomes due pursuant to the Construction Completion Schedule, and the same shall be deemed to have been made pursuant to this Agreement; and (ii) at the discretion of Lender, Lender may make disbursements either to Borrower, directly to the Construction Contractor, or directly to any subcontractor or any other persons entitled to make or receive payment of the Project costs in question in accordance with their respective contracts.

**2.3    Term of the Loan.**

(a)    Unless due and payable sooner pursuant to <u>Section 2.6</u> or <u>Article 8</u>, all principal, interest and other sums due under the Loan Documents shall be due and payable in full on February 28, 2010 (the "**Initial Maturity Date**"), provided that Borrower shall have the right to extend the Maturity Date (the "**Extension Option**") for an additional twelve (12) month term (such twelve (12) month period is hereinafter referred to as the "**Extension Term**"), thereby extending the Maturity Date to the twelfth (12th) month anniversary of the Initial Maturity Date (the "**Extended Maturity Date**").

(b)    Borrower may only exercise the Extension Option upon satisfying the following conditions:

(i)    Borrower shall have delivered to Lender written notice of such election no earlier than one hundred twenty (120) days and no later than ninety (90) days prior to the Initial Maturity Date;

(ii)    Lender shall have received Borrower's and each Principal's most recent financial statements, certified as correct by Borrower and each Principal. There must be no Material Adverse Change in Borrower's or any Principal's financial condition;

(iii)    Completion of the Improvements has been completed in accordance with all requirements of this Loan Agreement;

(iv)    Such notice is accompanied by a non-refundable extension fee equal to one quarter of one percent (0.25%) of the outstanding principal balance;

(v)    No Event of Default exists under the Loan Documents, nor any event exists which would be an Event of Default if not cured within the time allowed; and

(vi)    Project Yield must be equal to or greater than nine and one-half percent (9.5%);

(vii)    As of the date Borrower exercises the Extension Option and as of the date of the first day of the Extension Term, the Debt Service Coverage Ratio is greater than 1.15: 1.00.

**2.4    Prepayments.**

(a)    The Loan may not be voluntarily prepaid in full or in part prior to the first day of the sixteenth (16th) month after the date hereof (the "**Lockout Period**") unless Borrower (a) gives Lender at least seven (7) days' prior written notice, (b) pays the Net Cash Flow payments then due Lender, (c) pays the total amount of all interest which would accrue from the Closing Date through the end of the Lockout Period, less any interest actually paid, (d) pays the proportionate amount of the Exit Fee due hereunder based upon the amount of the Loan prepaid at such time, and (e) pays all other fees and costs due from Borrower to Lender including any attorneys' fees and disbursements incurred by Lender as a result of the prepayment. Thereafter,

Borrower shall have the right to make prepayments of the Loan in whole or in part at anytime without premium as long as Borrower pays the appropriate share of the Exit Fee.  In the event Lender declares the Loan immediately due and payable at a time when an Exit Fee would be due, such Exit Fee shall be paid upon any tender of payment at any time or upon acceleration of the Loan.  Borrower shall not be required to pay any portion of the Exit Fee at the time of the payment of any principal amortization or interest payment required under this Agreement.

(b)     In the event Borrower receives any payment with respect to a lease of the Project other than payments due under the lease including lease termination, cancellation or similar fees and insurance or condemnation proceeds, such payment shall be made to Lender and shall be applied by Lender to prepay the principal balance of the Loan and a proportionate share of the Exit Fee.

(c)     Notwithstanding any provision of this Agreement to the contrary, in no event shall all or any portion of the Exit Fee be due with respect to prepayments of the Loan due to application of insurance proceeds or takings claims.

**2.5     Interest.**

Provided that no Event of Default exists, the principal amount of the Loan outstanding from time to time shall bear interest until paid at a rate equal to a floating rate per annum equal to two and seventy five hundredths percent (2.75%) (275 basis points) plus the Base Rate (the aggregate rate referred to as the **"Interest Rate"**), but in no event shall the Interest Rate be lower than seven and eighty two hundredths percent (7.82%).  Interest shall be calculated based on a three hundred sixty (360) day year and charged for the actual number of days elapsed.  In no event shall the Holdback be deemed outstanding until such time as the same is disbursed hereunder.

**2.6     Monthly Payments.**

Commencing on March 1, 2007, Borrower shall pay interest computed on the outstanding principal balance of the Loan at the Interest Rate monthly in arrears on the first (1st) day of each month subject to the provisions of this Section 2.6.

Notwithstanding the amount due at the Interest Rate, commencing March 1, 2007, Borrower shall make monthly payments in an amount equal to Net Cash Flow for the calendar month which is two months in arrears (for example, on July 1st, a monthly payment equal to the Net Cash Flow for the month of May shall be due).  Borrower's monthly Net Cash Flow payments shall be applied in the following order of priority: (1) first, to interest due in arrears at the interest rate on the A Note for the immediately preceding calendar month, (2) second, to interest due in arrears at the interest rate on the B Note on the outstanding principal balance of the B Note for the immediately preceding calendar month, (3) third, to principal outstanding on the A Note, (4) fourth, to principal outstanding on the B Note for the immediately preceding calendar month, (5) fifth, to the Exit Fee.

To the extent that interest at the Interest Rate for any month exceeds the monthly Net

Cash Flow payment made, the excess interest ("**Accrued Interest**") shall immediately accrue and be added to principal outstanding on the Loan, and shall itself bear interest at the Interest Rate. Subject to the provision of Section 2.9 below, Lender shall have sole discretion in determining the amount of the Accrued Interest added to the A Note and the amount of the Accrued Interest added to the B Note. The aggregate outstanding amount of Accrued Interest shall not exceed One Million and 00/100 Dollars ($1,000,000.00) (the "**Maximum Interest Accrual**"). In the event Accrued Interest reaches the Maximum Interest Accrual, no further interest accrual shall be permitted, and Borrower shall immediately commence monthly payments equal to the greater of (a) interest on the outstanding principal balance of the Loan at the Interest Rate or (b) Net Cash Flow for the month which is two months in arrears. If Net Cash Flow due in a month exceeds the current interest due at the Interest Rate for such month, Borrower's payment of Net Cash Flow will be limited to the amount necessary to pay first, current interest due and second, Accrued Interest. Once a repayment of Accrued Interest has occurred, Borrower shall not be permitted to again accrue interest for such amount of Accrued Interest that has been repaid.

In addition to any payments due as described elsewhere in this Section 2.6, commencing on the first day of the twenty-fourth (24th) month after the Closing Date and continuing on the first day of each month thereafter until all amounts due under the Loan Documents are repaid, Borrower shall make monthly payments of principal to Lender equal to the principal amortization which would be payable on a direct reduction mortgage loan having a principal balance equal to the outstanding principal balance of the Loan based on an amortization period of twenty five (25) years and an interest rate equal to the Interest Rate on the date preceding the date of such calculation.

Monthly payments due to Lender as described in this Section 2.6 shall be paid to Lender by Automated Clearing House debit of immediately available funds from the financial institution account designated by Borrower in the Automated Clearing House debit authorization executed by Borrower in connection with this Agreement; and shall be effective upon receipt. Borrower shall execute any and all forms and documentation necessary from time to time to effectuate such automatic debiting. In no event shall any such payments be refunded to Borrower.

## 2.7    Exit Fee.

Upon the repayment of the Loan (whether on the Maturity Date or on any other date) or upon the acceleration of the Loan by Lender as provided herein, Borrower will pay to Lender an exit fee equal to Four Hundred Forty Three Thousand One Hundred Twenty Five and 00/100 Dollars ($445,625.00) LESS any portion of the Exit Fee already paid to Lender pursuant to Section 2.4, above, PLUS, if the Loan is repaid during the Lockout Period or accelerated by Lender so that the Loan becomes due during the Lockout Period, an amount equal to the amount of interest that would have accrued at the Interest Rate (assuming a Base Rate equal to the Base Rate effective on the day the Loan is repaid or accelerated by Lender) from the repayment or acceleration date through the end of the Lockout Period (collectively, the "**Exit Fee**"). The Exit Fee shall be due whether or not there are sufficient funds generated from the Property or from Net Proceeds to pay the Exit Fee.

## 2.8    Default Interest and Late Charge.

(a)      So long as an Event of Default remains outstanding, interest shall accrue at a rate per annum equal to five percentage points (500 basis points) in excess of the Interest Rate otherwise applicable on each outstanding disbursement of the Loan, but shall not at any time exceed the highest rate permitted by law (the **"Default Rate"**).

(b)      If payments of principal (other than the final payment of principal), interest due on the Loan, or any other amounts due hereunder or per the Note or the other Loan Documents are not timely made and remain overdue for a period of fifteen (15) days after written notice, Borrower, without notice or demand by Lender, promptly shall pay an amount (**"Late Charge"**) equal to four percent (4%) of each delinquent payment.  Notwithstanding the foregoing, to the extent permitted by applicable law, the Late Charge (i) shall commence five (5) days after the due date, and (ii) shall be in the amount of five percent (5%) of each delinquent payment.

**2.9      Allocation of Payments.**

The Interest Rate on the A Note and on the B Note shall be determined by Lender in its sole discretion, provided that (i) the weighted average of such interest rates does not exceed the Interest Rate which would otherwise be applicable to the Loan at any time while the Loan is outstanding, and (ii) the aggregate payments due under the A Note and the B Note do not exceed the payments which would otherwise have been due had the A Note and the B Note been a single promissory note for the outstanding amount of the Loan at the Interest Rate.  Lender may in its sole discretion allocate Exit Fees and other payments (including principal and interest payments) made by Borrower hereunder to the A Note or the B Note, provided that the aggregate payments due under the A Note and the B Note do not exceed the payments which would otherwise have been due had the A Note and the B Note been a single promissory note for the outstanding amount of the Loan at the Interest Rate and on all other terms and conditions of this Agreement.

**2.10      Release Provisions.**

(a)      Borrower intends to sell portions of the Land, containing an aggregate of approximately 497,891 square feet of land as described in <u>Exhibit D</u> (each such parcel, a **"Release Parcel"**).

(b)      Lender agrees to release from the lien of the Mortgage a Release Parcel, but only upon the satisfaction of all of the following conditions:

(i)      Lender shall have received from Borrower at least twenty (20) days' prior written notice of the date proposed for such release (the **"Release Date"**);

(ii)      No Event of Default shall have occurred and be continuing as of the date of such notice and Release Date;

(iii)      Borrower shall provide Lender with evidence acceptable to Lender that the Release Parcel has been (or on January 1st of the year following the recordation of the applicable subdivision plan will be) formally designated as a distinct tax lot separate and legally subdivided from the remainder of the Land;

(iv)    The release shall occur contemporaneously with the transfer of fee title to the Release Parcel to a person or entity who is not Borrower or an Affiliate of Borrower, except as to the Walgreen's Outparcel, which may be wholly or partially owned by an Affiliate of Borrower, provided that the sale of the Walgreen's Outparcel shall be at fair market value;

(v)    Borrower, at its sole cost and expense, shall have delivered to Lender one or more endorsements of the mortgagee policy of title insurance delivered to Lender on the date hereof in connection with the Mortgage insuring that, after giving effect to such release, (x) the lien created hereby and insured under such title policy is a first priority lien on the remaining Property subject only to the Permitted Encumbrances applicable to the remaining Property, (y) such title policy is in full force and effect and unaffected by such release, and (z) if Lender shall require a recorded easement agreement or declaration as described in clause (vii) below, the benefits of such easement agreement or declaration shall be insured under such policy;

(vi)    Borrower, at its sole cost and expense, shall have delivered to Lender a current ALTA/ACSM survey of the remaining Property without the Release Parcel in form and substance acceptable to Lender;

(vii)    If required by Lender, Borrower and the owner of the Release Parcel shall have entered into a recorded easement agreement or declaration binding upon the owner of the Release Parcel and its successors and assigns granting to Borrower and any successor owner of the remaining Property such easements and rights, and imposing such restrictions, as Lender may require, including, without limitation, rights of access and use and restrictions relating to the use, development and maintenance of the Release Parcel; such agreement or declaration shall run with the land for the term of the Loan including any extensions, plus two (2) years;

(viii)    Borrower shall have delivered or cause to be delivered to Lender evidence acceptable to Lender that (i) the Property remaining after giving effect to release, including the location, existence, use, occupancy and operation thereof, is in compliance with all applicable Legal Requirements, including, without limitation, the building and zoning laws of the jurisdiction in which the Property is situated and all easements, declarations, covenants and restrictions affecting the Property and has unencumbered ingress and egress to the Property; and (ii) all conditions precedent to the release of the Release Parcel contained in this Loan Agreement have been complied with;

(ix)    All of the Net Proceeds with respect to the Transfer of the Release Parcel shall be paid to Lender and applied to the principal balance of the Loan;

(x)    The Net Proceeds with respect to the Transfer of the first Release Parcel shall not be less than one hundred percent (100%) of the Projected Net Proceeds;

(xi)     The aggregate Net Proceeds from the Transfer of any Release Parcel, together with the Net Proceeds of the Transfer of all Release Parcels previously released from the Mortgage, shall not be less than one hundred percent (100%) of the aggregate of the Projected Net Proceeds for such parcels; and

(xii)     Borrower shall have paid all of Lender's costs and expenses, including, without limitation, reasonable attorneys' fees and expenses, in connection with the release of the Release Parcel.

(c)  Upon the satisfaction of the conditions set forth in subparagraph (a) above for the release of a Release Parcel, the security interests and liens of Lender under the Mortgage and the other Loan Documents shall be released from the Release Parcel, and Lender will execute and deliver any agreements reasonably requested by Borrower to release and terminate the lien of the Mortgage as to the Release Parcel; provided, however, that such release and termination shall be without recourse to Lender and made without any representation or warranty.  Upon the release and termination of Lender's security interest and liens under the Mortgage and the other Loan Documents relating to the Release Parcel, all references in the Mortgage and the other Loan Documents relating to the Release Parcel shall be deemed deleted, except as otherwise provided herein with respect to indemnities or except as otherwise provided in any of the other Loan Documents.

## ARTICLE 3
## FINANCIAL REPORTING COVENANTS

**3.1     Financial Information Reporting.**

(a)     Monthly Information.  Within fifteen (15) days following the end of each month, Borrower shall deliver to Lender: (i) monthly unaudited operating statements for the Project, certified as true, complete and correct by Borrower showing actual sources and uses of cash during the preceding month, (ii) a current rent roll (including monthly delinquency reports and a monthly schedule of delinquency receipts and payments) and (iii) a summary of all leasing activity then taking place with respect to the Project, particularly describing the status of all pending lease negotiations, if any.  For any period in which Borrower is obligated to pay Lender all or a portion of Net Cash Flow (or at other times as requested by Lender), Borrower shall deliver to Lender, within twenty (20) days after the end of every calendar month during the term of the Loan, a statement and report, on a form approved by Lender in its sole and absolute discretion, detailing Borrower's calculation of Revenue and Net Cash Flow for such month. Upon Lender's request, Borrower shall deliver to Lender back-up documentation for such period as Lender shall reasonably specify (including, without limitation, invoices, receipts and other evidence of costs incurred) evidencing the propriety of the deductions from revenues in determining Revenue and Net Cash Flow.

(b)     Quarterly Information.  Borrower shall deliver to Lender quarterly financial statements (including, balance sheet, an income statement and a statement of cash flows) of Borrower within fifteen (15) days after the end of each calendar quarter.  Unless otherwise requested more frequently by Lender, within twenty (20) days after the end of every calendar

quarter during the term of the Loan, Borrower shall cause each Principal to provide Lender with written confirmation of his/her/its compliance with the net worth covenant of Principal contained in Section 4.4, below, which evidence could include, without limitation, a certified financial statement or a statement from Principal that there has been no material adverse change in the financial condition of Principal since the certified financial statement most recently delivery to Lender.

(c)   Annual Information.  Borrower has delivered to Lender the Project's updated annual operating budget for the first fiscal year.  No later than thirty (30) days before the end of each fiscal year of Borrower, Borrower shall deliver to Lender the Project's updated annual operating budget for the following fiscal year.  No later than thirty (30) days after the end of each calendar year, Borrower shall deliver or cause to be delivered to Lender annual financial statements (including, balance sheet, an income statement and a statement of cash flows) of Borrower, certified by an officer or manager of Borrower. Unless otherwise requested more frequently by Lender, Borrower shall cause Principals to provide Lender with his annual certified financial statements within twenty (20) days after each calendar year.

3.2   **Financial Information Form and Examination.**

In addition to the foregoing required information, Borrower shall provide to Lender any additional financial information or back-up documentation Lender may reasonably request.  All financial statements to be provided to Lender as described herein shall be in a format approved in writing by Lender in Lender's reasonable discretion, in accordance with sound accounting practices prepared on a consistent basis, which fairly present the financial condition(s) as of the date(s) indicated.  Lender may request that either the Borrower's or any Principal's annual financial statement be audited by an independent certified public accountant reasonably acceptable to Lender, at Borrower's sole cost and expense, at any time after an Event of Default has occurred or after Lender asserts any claim under the Limited Joinder attached hereto. Each financial statement shall be certified as true, complete and correct by its preparer and by Borrower or, in the case of any Principal's financial statements, by any Principal. Borrower and any Principal shall provide such additional financial information as Lender reasonably requires (which may include specific information concerning Borrower's, Managing Member's and any Principal's other real estate holdings, including property income and expenses, debt service requirements and occupancy).  Borrower shall during regular business hours permit Lender or any of Lender's representatives (including an independent firm of certified public accountants) to have access to and examine all of its books and records regarding Borrower, Managing Member, and/or any Principal and the development and operation of the Project.  Borrower shall within ten (10) days after Lender's request, furnish Lender with a written statement, duly acknowledged, setting forth the sums then owing under the Loan Documents according to Borrower's books and records and any right of set-off, counterclaim or other defense that exists against such sums and Borrower's obligations under the Loan Documents.

**ARTICLE 4**
**OPERATIONAL AND OTHER COVENANTS**

4.1   **Leasing and Operational Covenants.**

(a)      Leasing Restrictions.  Without the prior written consent of Lender, Borrower shall not (i) enter into any leases, (ii) materially modify the form of lease previously approved by Lender, (iii) materially modify, or amend or terminate any Lease, (iv) accept any rental payment more than thirty (30) days in advance of its due date or (v) enter into any ground lease of the Project.  Notwithstanding the foregoing, Borrower shall have the right to terminate any Lease for space less than seven thousand five hundred (7,500) of the rentable square feet of space in the Project without first obtaining Lender's approval.  Borrower shall provide Lender not less than ten (10) Business Days to review any proposed leases and any proposed modifications or amendments to any Lease.  All Leases must contain an automatic attornment provision whereby in the event of a foreclosure, the tenant automatically shall recognize the successor owner as landlord and such tenant shall have no right to terminate its Lease in the event of such foreclosure.  If Borrower enters into any new Lease or any modification or renewal of any existing Lease, at Lender's request, Borrower shall cause the Tenant thereunder to execute a subordination and attornment agreement substantially in the form of Exhibit K.  Borrower shall provide Lender with a copy of the fully executed original of all Leases promptly following their execution.  Notwithstanding the foregoing, so long as no Event of Default exists Borrower may, without Lender's prior written consent, enter into any Lease for less than seven thousand five hundred (7,500) of the rentable square feet of space in the Project so long as: (A) such Lease is on the form substantially the same as that previously approved by Lender; (B) the term of such Lease is at least five (5) years; (C) the rent for such Lease is not less than ninety-five percent (95%) of the previously agreed-to market rent and the rent for any renewal option is not less than ninety-five percent (95%) of the previously agreed-to market rent at the time of renewal; (D) the tenant improvement costs relating to such Lease to be paid by Borrower are comparable to improvements made for other tenants engaged in a similar business; and (E) the aggregate rentable square feet leased pursuant to all Leases entered into without Lender's consent pursuant to this sentence during the term of the Loan is less than twenty-five percent (25%) of the total rentable square feet at the Project.  Notwithstanding the foregoing, any proposed tenants that cause the internet related tenancy of the Project to exceed twenty-five percent (25%) of the total Project tenancy, measured as either a percentage of square footage or rental income, must be approved by Lender, in Lender's sole discretion.  Internet-related tenants are defined as any tenant who derives more than thirty-five percent (35%) of their revenue, or anticipated revenue, from Internet activities and/or sources.

(b)      Defaults Under Leases.  Borrower will use good faith efforts not to suffer or permit any material breach or default to occur in any of Borrower's obligations under any of the Leases nor suffer or permit the same to terminate by reason of any failure of Borrower to meet any requirement of any Lease including those with respect to any time limitation within which any of Borrower's work is to be done or the space is to be available for occupancy by the lessee.  Borrower shall notify Lender promptly in writing in the event a Tenant commits a material default under a Lease.

(c)      Project Management.  Lender hereby approves Gemini Management Company, LLC, a North Carolina limited liability company, as the manager of the Project.  Borrower shall not change the manager of the Project or enter into, modify, amend, terminate or cancel any management contracts for the Project without the prior written approval of Lender, which approval shall not be unreasonably withheld, conditioned or delayed.  Any fee to Borrower or any

Affiliate of Borrower for management of the Project shall be subject and subordinate to all debt service due to Lender.

      (d)      <u>Furnishing Notices</u>. Borrower shall provide Lender with copies of all notices of default, notices of violation of law, notices of taking, notices of insurance cancellation, and other notices which jeopardize, or threaten to jeopardize, the operation of the Project received by Borrower from any Tenant, Principal, Governmental Authority or insurance company within ten (10) Business Days after such notice is received. In addition, Borrower shall promptly provide Lender with written notice of any litigation, arbitration, or other proceeding or governmental investigation pending or, to Borrower's or Principal's knowledge, threatened against Borrower, Principal or Managing Member relating to the Project. Notwithstanding the foregoing, Borrower shall not be obligated to provide Lender with such written notice in respect of personal injury litigation against Borrower or the Project if the amount claimed is less than One Hundred Thousand and 00/100 Dollars ($100,000.00), as long as the maximum liability under such cases is less than the amount of liability insurance maintained by Borrower (plus Borrower's deductible) and the insurance carrier has not refused the tender of defense or coverage. Furthermore, upon the written request of Lender, Borrower shall promptly provide Lender with a written statement detailing all capital or other equity contributions to Borrower.

      (e)      <u>Alterations</u>. Without the prior written consent of Lender, which consent shall not be unreasonably withheld, Borrower shall not make any Material Alterations to the Project, except for tenant improvements required by the terms of Leases and improvements contemplated by the Construction Documents. For purposes of this Agreement, "Material Alterations" shall be deemed to be an alteration to the Project which is reasonably estimated to cost in excess of $100,000.00 to perform.

      (f)      <u>Cash Distributions</u>. Unless (i) Completion has occurred, and (ii) Debt Service Coverage Ratio is greater than 1.10: 1.00, Borrower shall not make any distributions to partners, members or shareholders.

      (g)      <u>Replacement Reserve</u>. Commencing with the third Loan Year, Borrower shall expend at least $0.15/per square foot on maintenance of the Project. To the extent Borrower does not provide evidence, reasonably satisfactory to Lender, that Borrower has spent such sum on a cumulative annual basis, Borrower shall pay Lender such amount not spent. Lender shall hold such sum for Borrower's use to fund future maintenance expenses, after Borrower has spent at least $13,749.00 in the aggregate during the then current Loan Year. The remaining portion, if any, of any such sum held by Lender may be applied to the Indebtedness upon the occurrence of an Event of Default or, upon payment in full of the Loan and all amounts due under the Loan Documents, shall be paid to Borrower.

      (h)      <u>Construction</u>. The Improvements shall be completed in substantial accordance with the Construction Documents and in compliance with all applicable Laws, regulations, ordinances, codes, permits, licenses, declarations, covenants, or restrictions of record or other agreements relating to the Project or any part thereof. Borrower shall not amend or modify the Construction Documents without first obtaining Lender's prior written consent (an "**Approved Change**"); provided that Borrower may implement change orders (each a "Change Order" and

collectively, the **"Change Orders"**) to the Construction Budget and Construction Documents without Lender's prior written approval if (i) the Change Order is for less than $50,000.00, (ii) the aggregate sum of all Change Orders does not exceed $200,000.00 and (iii) the Change Order does not materially alter the design or quality of the Project, (each a **"Minor Change"**). Borrower shall submit all other Change Orders to Lender for review and approval, which review shall be completed within ten (10) Business Days after all required documentation shall have been provided to Lender. In no event shall Borrower be permitted to reallocate funds from a hard cost line item to a soft cost line item in the Construction Budget or reallocate any funds regarding the interest reserve or developer's overhead fee. Borrower shall keep the Loan "in balance" at all times prior to Completion. The Loan is "in balance" when the remaining undisbursed proceeds of the Loan (including any retainage held by Lender), together with any deposits previously made by Borrower and held by Lender, are sufficient to complete construction of the Improvements in substantial accordance with the Construction Documents, Construction Budget and Change Orders permitted by this Agreement and to pay all interest, fees and charges relating to the construction of the Improvements and the Loan (as estimated by Lender) through the Completion Date including, without limitation, legal, architectural and engineering fees and escrow and title charges. At Lender's request, Borrower shall demonstrate to Lender's satisfaction that the Loan is "in balance."

(i)　　Completion.　Borrower shall cause Completion of all of the Improvements on or before the date which is eighteen (18) months after the Closing Date (the **"Completion Date"**); provided that if Completion is delayed due to fire or other casualty, adverse weather, labor disputes or other causes beyond Borrower's control (collectively, **"Force Majeure Events"**), the Completion Date shall be extended by such time as Lender's Consultant shall determine is reasonable based upon the delay caused by the Force Majeure Event. **"Completion"** means 100% completion of the Improvements (subject to usual and customary punch list items which do not adversely affect Borrower's ability to lease or operate the Project) in compliance with all applicable laws, and in substantial accordance with the Construction Documents and Change Orders permitted by this Agreement, free and clear of all liens, claims, encumbrances and rights of others (other than those created by liens for taxes and assessments that are not delinquent and those liens which Borrower is contesting in accordance with the terms of this Agreement), as evidenced by the issuance of certificates of Completion by Lender's Consultant and Borrower's architect in form and substance reasonably acceptable to Lender and a final certificate of occupancy. Within thirty (30) days after Completion, Borrower shall furnish Lender two (2) copies of a survey of the completed Project prepared by a registered land surveyor in accordance with the 2005 American Land Title Association/American Congress on Surveying and Mapping Standards and certified in favor of Borrower, Lender and the title insurer, in form and substance acceptable to Lender.

(j)　　Compliance.　All work on the Project shall be performed by the Construction Contractor or subcontractor engaged by the Construction Contractor and shall substantially conform to the Plans approved by Lender and shall be of good quality and workmanship. Any work, material, or equipment not so conforming to the Plans that would in any way negatively affect the structural soundness, utility, size, or value of the Improvements may be disapproved by Lender and shall be replaced or revised as may be required to bring about conformity promptly thereafter, at no expense to Lender. There shall be no change or amendment to the Construction

Contract, the contract with the Architect, or the Plans without the prior written consent of Lender, except that immaterial changes in the Plans not affecting in any way the structural soundness, utility, size, value, appearance, or quality of any of the Improvements shall not require Lender's prior consent.  Lender shall not unreasonably withhold, condition or delay its consent to any such changes or amendments.

(k) Compliance With Laws.  Borrower shall comply with all applicable requirements (including applicable Laws) of any Governmental Authority having jurisdiction over Borrower or the Project including all building, zoning, density, land use, covenants, conditions and restrictions, subdivision requirements (including parcel maps and environmental impact and other environmental requirements), whether now existing or later to be enacted and whether foreseen or unforeseen unless grandfathered under prior laws or under permits or waivers obtained by Borrower.

(l) Use of Project.  Unless required by applicable Law or approved by Lender in writing, Borrower shall not permit changes to the Improvements or the use thereof.  Without Lender's prior written consent, Borrower shall not (i) initiate or acquiesce in a change in the plat of subdivision, or zoning classification or use of the Project, or (ii) grant any encumbrances or easements burdening the Project, except such encumbrances or easements that do not adversely affect the current or anticipated use of the Project.

(m) No Commingling of Funds.  Borrower shall not commingle the funds related to the Project with funds from any other property.

(n) Maintenance and Preservation of the Project.  Borrower shall keep the Project in good condition and repair (normal wear and tear excepted) and if all or part of the Project becomes damaged or destroyed, Borrower shall promptly and completely repair and/or restore the same in a good and workmanlike manner in accordance with sound building practices; provided that Borrower shall be relieved of such obligation to the extent Lender applies any insurance or condemnation proceeds to the Loan.  Borrower shall not commit or allow waste or permit impairment or deterioration of the Project.  Borrower shall reasonably perform such acts to preserve the value of Project and Borrower shall not abandon the Project.

(o) Governmental Approvals.  Borrower shall use good faith efforts to not permit any Governmental Approvals issued in connection with the development of the Project (to the extent that any such permits or Governmental Approvals continue to remain necessary for the construction of the Project) to expire and will proceed with the development of the Project according to the plans approved by the Governmental Authorities and in compliance with any time schedules or time limits imposed by such Governmental Authorities.  In no event shall any portion of the construction be performed in or on the Land unless all permits and Governmental Approvals required in connection with the performance of such portion of the construction are then in full force and effect.  All Governmental Approvals must be legally valid and remain in full force and effect throughout the construction of the Project (or, to the extent applicable, such lesser time period as shall be required by such authorities and/or by applicable Law for the performance of the construction to which such Governmental Approvals relate).  In the event that any of such Governmental Approvals or permits is invalidated, rescinded or suspended during

such time period, Lender will not be obligated to make disbursements of Loan proceeds during the period that any invalidation, rescission or suspension continues. Borrower shall take all necessary steps to cause any such invalidated, rescinded or suspended permits and Governmental Approvals to be reinstated to full force and effect within thirty (30) days of their invalidation, rescission or suspension, as the case may be.

(p)     Food Lion Agreements. Borrower shall comply with all of Borrower's obligations under the provisions of the Food Lion Lease.

**4.2     Other Borrower Covenants.**

Borrower further covenants and agrees as follows:

(a)     Loan Closing. Unless waived by Lender, all conditions precedent to the closing of the Loan shall be complied with on or prior to the Closing Date. If such conditions are not complied with as of the Closing Date, Lender may terminate Lender's obligation to fund the Loan by written notice to Borrower.

(b)     Prohibition of Assignments and Transfers by Borrower.

(i)     Generally. Borrower shall not assign or attempt to assign its rights under this Agreement and any purported assignment shall be void. Without the prior written consent of Lender, which consent may be withheld in Lender's sole discretion, Borrower shall not suffer or permit any Transfer except as otherwise permitted herein. In addition, if Managing Member fails to continue to Control (i) the day to day management and operation of Borrower's business; and (ii) all material business decisions (including a sale or refinance) for Borrower during the term of the Loan, then Lender may, at Lender's option, declare the Loan to be immediately due and payable, and Lender may invoke any remedies permitted by the Loan Documents.

(ii)     Transfers Prohibited by ERISA. In addition to the prohibitions set forth in Section 4.2(b)(i), above, Borrower shall not engage in or permit a Transfer that would constitute or result in the occurrence of one or more non-exempt prohibited transactions under ERISA or the Internal Revenue Code. Borrower agrees to unwind any such Transfer upon notice from Lender or, at Lender's option, to assist Lender in obtaining such prohibited transaction exemption(s) from the Employee Benefits Security Administration with respect to such Transfer as are necessary to remedy such prohibited transactions. In addition to its general obligation to indemnify Lender under Section 4.2(k), Borrower shall reimburse Lender for any Expenses incurred by Lender to obtain any such prohibited transaction exemptions. Borrower's obligations under this Section 4.2(b)(ii) shall survive the expiration of this Agreement and the other Loan Documents.

(c)     Mechanics' Liens and Contest Thereof. Borrower will use good faith efforts to not suffer or permit any mechanics' lien claims to be filed or otherwise asserted against the Project and will promptly discharge the same in case of the filing of any claims for lien or proceedings for the enforcement thereof, provided, however, that Borrower shall have the right to contest in good faith and with reasonable diligence the validity of any such lien or claim provided

that Borrower notifies Lender of its desire to do so in writing and posts a statutory lien bond or title insurance coverage that removes or insures over such lien from title to the Project within twenty (20) days after the earlier of written notice by Borrower to Lender of the existence of such lien or written notice by Lender to Borrower of the existence of the lien. Lender will not be required to make any further disbursements of the proceeds of the Loan unless or until either (i) all mechanics' lien claims have been removed, or completely bonded over, or insured over by the Title Insurer, or (ii) Lender, at its sole option, elects to restrict disbursements to reserve sufficient sums to pay 150% of all such lien claims. In the event either Borrower shall fail to discharge any such lien or prosecute such contest as set forth above, or such lien is not otherwise fully reserved for or bonded over as set forth above, Lender may, at its election in its sole discretion, cause such lien to be satisfied and released or otherwise provide security to the Title Insurer to indemnify over such lien. Any amounts so expended by Lender, including premiums paid or security furnished in connection with the issuance of any surety company bonds, shall be deemed to constitute disbursement of the proceeds of the Loan hereunder owing to Lender by Borrower.

(d)     Renewal of Insurance. Borrower shall timely pay all premiums on all insurance policies to assure that at all times Borrower has in effect insurance as required pursuant to the Insurance Requirements attached hereto as Exhibit E, and as and when additional insurance is required, from time to time, and as and when any policies of insurance may expire, furnish to Lender, premiums prepaid, additional and renewal insurance policies with companies, coverage and in amounts satisfactory to Lender. Borrower shall not bring or keep any article on the Project or cause or allow any condition to exist on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Borrower on the Project. Unless Borrower provides Lender with appropriate evidence of the insurance coverage required by this Agreement, Lender may purchase insurance at Borrower's expense to protect Lender's interests in the Project and to maintain the insurance required by this Agreement. Prior to purchasing any such insurance, Lender will use its good faith efforts to provide notice to Borrower of its intention to do so, provided, however, that Lender's failure to provide such notice shall not affect Borrower's responsibility for the expense of such insurance purchased by Lender. This insurance may, but need not, protect Borrower's interests. The coverage purchased by Lender may not pay any claim made by Borrower or any claim that is made against Borrower in connection with the Project or any required insurance policy. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with appropriate evidence that Borrower has obtained insurance as required by this Agreement. If Lender purchases insurance for the Project or insurance otherwise required by this Agreement, Borrower will be responsible for the costs of that insurance and other charges imposed by Lender in connection with the placement of the insurance until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the Indebtedness effective as of the date Lender purchases such insurance and such costs may be more than the cost of insurance Borrower is able to obtain on its own. The effective date of coverage may be the date the prior coverage lapsed or the date on which Borrower failed to provide Lender proof of coverage.

(e)     Payment of Taxes. Borrower shall, subject to the terms of Section 4.2(f) below, pay all real estate taxes and assessments and charges of every kind upon the Project before the same become delinquent, provided, however, that Borrower shall have the right to pay such tax under protest or to otherwise contest any such tax or assessment, but only if (i) such contest has

the effect of preventing the collection of such taxes so contested and also of preventing the sale or forfeiture of the Project or any part thereof or any interest therein, (ii) Borrower has notified Lender of Borrower's intent to contest such taxes, and (iii) Borrower has deposited security in form and amount satisfactory to Lender, in its sole discretion, and has increased the amount of such security so deposited promptly after Lender's reasonable request therefor. If Borrower fails to commence such contest or, having commenced to contest the same, and having deposited such security required by Lender for its full amount, shall thereafter fail to prosecute such contest in good faith or with due diligence, or, upon adverse conclusion of any such contest, shall fail to pay such tax, assessment or charge, Lender may, at its election (but shall not be required to), pay and discharge any such tax, assessment or charge, and any interest or penalty thereon, and any amounts so expended by Lender shall be deemed to constitute disbursements of the Loan proceeds hereunder (even if the total amount of disbursements would exceed the face amount of the Note). Borrower shall, unless Lender has paid such taxes directly on Borrower's behalf, furnish to Lender evidence that taxes are paid at least five business (5) days prior to the last date for payment of such taxes and before imposition of any penalty or accrual of interest.

(f)     Funds for Insurance and Taxes. Borrower shall pay to Lender, at the time of and in addition to the monthly installments of principal and/or interest due under the Note, a sum equal to 1/12 of the amount estimated by Lender to be sufficient to enable Lender to pay at least sixty (60) days before they become due and payable, all taxes, assessments and other similar charges levied against the Project and all insurance premiums relating to Borrower and the Project as determined by Lender (the "**Property Tax and Insurance Reserve**"). So long as no Event of Default exists hereunder and provided that Borrower shall have delivered to Lender a copy of the tax bill or insurance premium bill, as the case may be, and the Property Tax and Insurance Reserve is sufficient for the purpose of paying such tax bill and/or insurance premium bill, Lender shall apply the sums to pay such real estate tax items and/or insurance premiums, as the case may be. All sums so reserved may be commingled with the general funds of Lender, and shall not be deemed to be held in trust for the benefit of Borrower. The Property Tax and Insurance Reserve shall not be deemed to be a deposit with a depository institution insured by the Federal Deposit Insurance Corporation. If such amount reserved with Lender is insufficient to fully pay such tax items and/or insurance premiums, as the case may be, Borrower shall, within ten (10) days following notice at any time from Lender, remit such additional sum as may be required for the full payment of such tax items and/or insurance premiums, as the case may be. Borrower hereby grants Lender a first priority security interest in such funds, including all interest accruing thereon, and all such funds are pledged as additional collateral for the Loan and Borrower shall execute any other documents and take any other actions necessary to provide Lender with such a perfected security interest in such funds. Upon the Maturity Date or at any time following an Event of Default, the moneys then remaining reserved with Lender or its agent shall, at Lender's option, be applied against the Indebtedness. The obligation of Borrower to pay such tax items and/or insurance premiums is not affected or modified by the provisions of this paragraph.

(g)     Personal Property. All of Borrower's personal property, fixtures, attachments and equipment delivered upon, attached to, used or required to be used in connection with the operation of the Project (collectively, the "**Personal Property**") shall always be located at the Project and shall be kept free and clear of all liens, encumbrances and security interests.

Borrower shall not (nor shall it permit any Tenant to), without the prior written consent of Lender, sell, assign, transfer, encumber, remove or permit to be removed from the Project any of the Personal Property. So long as no Event of Default has occurred and is continuing, Borrower may sell or otherwise dispose of the Personal Property when obsolete, worn out, inadequate, unserviceable or unnecessary for use in the operation of the Project, but, if material to the operation of the Project, only upon replacing the same with other Personal Property at least equal in value and utility to the Personal Property that is disposed.

(h)   Appraisals. Lender shall have the right to obtain a new or updated Appraisal of the Project from time to time, and Borrower shall cooperate with Lender in this regard. The Borrower shall pay for any such Appraisal if an Event of Default exists, or if the Appraisal is the first Appraisal obtained by Lender during any Loan Year.

(i)   Loss of Note or other Loan Documents. Upon notice from Lender of the loss, theft, or destruction of the Note and upon receipt of an affidavit of lost note and an indemnity reasonably satisfactory to Borrower from Lender, or in the case of mutilation of the Note, upon surrender of the mutilated Note, Borrower shall make and deliver a new note of like tenor in lieu of the then to be superseded Note. If any of the other Loan Documents were lost or mutilated, Borrower and/or Lender agrees to execute and deliver replacement Loan Documents in the same form of such Loan Document(s) that were lost or mutilated upon notice from Borrower or Lender to the other.

(j)   Publicity. Lender reserves the right to publicize the making of the Loan and, in such publicity, may include a brief description of the Project and the Loan.

(k)   Indemnification. Borrower shall indemnify Lender, including each party owning an interest in the Loan and their respective successors, assigns, officers, directors, employees and consultants (each, an "**Indemnified Party**") and defend and hold each Indemnified Party harmless from and against all claims, injury, damage, liability, criminal and civil penalties, excise taxes and Expenses of any and every kind to any persons or property by reason of (i) the operation or maintenance of the Project; (ii) any breach of representation or warranty, default or Event of Default hereunder or under any of the other Loan Documents; or (iii) any other matter arising in connection with the Loan, Borrower, or any Principal, any Lease or any Tenant, or the Project. Notwithstanding the immediately preceding sentence, no Indemnified Party shall be entitled to be indemnified against its own gross negligence or willful misconduct. Upon written request by an Indemnified Party, Borrower will undertake, at its own costs and expense, on behalf of such Indemnified Party, using counsel reasonably satisfactory to the Indemnified Party, the defense of any legal action or proceeding whether or not such Indemnified Party shall be a party and for which such Indemnified Party is entitled to be indemnified pursuant to this section. At Lender's option, Lender may, at Borrower's expense, prosecute or defend any action involving the priority, validity or enforceability of any of the Loan Documents.

(l)   No Additional Debt or Encumbrances. Except for the Loan, Borrower shall not (i) incur any indebtedness (whether personal or nonrecourse, secured or unsecured) including, without limitation, for borrowed money, liabilities under guaranties, or reimbursement obligations of lessee under capital or operating leases other than customary trade payables paid

within sixty (60) days after they are incurred, and (ii) permit there to be any encumbrances against the Project except the Permitted Exceptions. Borrower shall also not default on the payment of any indebtedness that is not cured within the time, if any, specified therefor in any agreement governing the same.

(m) <u>Organizational Documents</u>. Borrower shall not, without the prior written consent of Lender, permit or suffer (i) a material amendment or modification of its Organizational Documents or the organizational documents of any entity which is a member or manager of Borrower, (ii) the admission of any new member, partner or shareholder, (iii) any dissolution or termination of its existence, or (iv) change in its state of formation or incorporation or its name.

(n) <u>Single Purpose Entity</u>. Borrower shall at all times remain a Single Purpose Entity until after the Indebtedness has been repaid in full.

(o) <u>Furnishing Reports</u>. Upon Lender's request, Borrower shall provide Lender with copies of all inspections, reports, test results and other information received by Borrower, which in any way relate to the Project or any part thereof.

(p) <u>Affiliate Transactions</u>. Prior to entering into any agreement with an Affiliate pertaining to the Project, Borrower shall deliver to Lender a copy of such agreement, which shall be satisfactory to Lender in its reasonable discretion. If requested by Lender, such agreement shall provide Lender the right to terminate it upon Lender's (or its designee's) taking possession of the Project or acquisition of the Project through foreclosure, a deed in lieu of foreclosure, UCC sale or otherwise.

(q) <u>Site Visits, Observation and Testing</u>. Lender and its agents and representatives shall have the right at any reasonable time to enter and visit the Project for the purpose of performing appraisals, observing the Project, inspecting the progress of construction of the Project, taking and removing soil or groundwater samples, and conducting tests on any part of the Project. Lender has no duty, however, to visit or observe the Project or to conduct tests, and no site visit, observation or testing by Lender, its agents or representatives shall impose any liability on any of Lender, its agents or representatives. Neither Borrower nor any other party is entitled to rely on any site visit, observation or testing by any of Lender, its agents or representatives. Neither Lender, its agents nor representatives owe any duty of care to protect Borrower or any other party against, or to inform Borrower or any other party of any other adverse condition affecting the Project. Lender shall give Borrower reasonable notice before entering the Project. Lender shall make reasonable efforts to avoid interfering with Borrower's use of the Project in exercising any rights provided in this <u>Section 4.2(q)</u>. If there has not been an Event of Default, Lender shall repair and restore any damage to the Project as a result of it exercising its rights under this Section 4.2(q).

(r) <u>Compliance With U.S.A. Patriot Act and Anti-Terrorism Laws</u>. Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "**Patriot Act**"), and Lender's policies and practices, Lender is required to obtain, verify and record certain information and documentation that identifies Borrower and each Principal, which information includes the name and address of

Borrower and each Principal and such other information that will allow Lender to identify such party in accordance with the Patriot Act. Borrower is not, and will not become a person (individually, a **"Prohibited Person"** and collectively, **"Prohibited Persons"**) either listed on the specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, U.S. Department of the Treasury (the **"OFAC List"**) or otherwise subject to any other prohibition or restriction imposed by laws, regulations or executive orders, including Executive Order No. 13224, administered by the Office of Foreign Asset Control, U.S. Department of the Treasury (collectively the **"OFAC Rules"**). Borrower (i) is not and will not become owned or controlled by a Prohibited Person, (ii) is not acting and will not act for or on behalf of a Prohibited Person, (iii) is not otherwise associated with and will not become associated with a Prohibited Person, (iv) is not providing and will not provide material, financial or technological support or other services to or in support of acts of terrorism of a Prohibited Person. Borrower will not transfer any interest in Borrower to, or enter into a Lease with, any Prohibited Person. Borrower will not enter into any Lease or undertake any activities related to this Agreement in violation of the Federal Bank Secrecy Act, 31 U.S.C. §5311, *et seq.* or any federal or state laws, including but not limited to, 18 U.S.C. §§1956, 1957 and 1960 prohibiting money laundering and terrorist financing (collectively, **"Anti-Money Laundering Laws"**). Borrower shall provide information as Lender may require from time to time to permit Lender to satisfy its obligations under the Patriot Act, the OFAC Rules or the Anti-Money Laundering Laws. Borrower shall immediately notify Lender if Borrower has knowledge that any Tenant, any Principal or any member or beneficial owner of Borrower or any Principal is or becomes a Prohibited Person or (A) is convicted of, (B) pleads nolo contendere to (C) is indicted on or (D) is arraigned and held over on charges under the Anti-Money Laundering Laws or involving money laundering or predicate crimes to money laundering.

(s)     Notice of Change.  Borrower shall give Lender prior written notice of any change in: (i) the location of its place of business or its chief executive office if it has more than one place of business; (ii) the location of any of the Personal Property, including Borrower's books and records; and (iii) Borrower's name or business structure. Unless otherwise approved by Lender in writing, all Personal Property (other than the books and records) will be located at the Project and all books and records will be located at Borrower's place of business or chief executive office if Borrower has more than one place of business.

(t)     No Use of Merrill Lynch Name.  Borrower shall not directly or indirectly publish, disclose or otherwise use in any advertising or promotional material, or press release or interview, the name, logo or any trademark of Lender, Merrill Lynch & Co., Inc. or any of their affiliates.

**4.3     Authorized Representative.**

Borrower hereby appoints William Obeid as its **"Authorized Representative"** for purposes of dealing with Lender on behalf of Borrower in respect of any and all matters in connection with this Agreement, the other Loan Documents, and the Loan. Subject to the terms of Section 4.2(b) above (concerning transfers by Borrower), the Authorized Representative shall have the power, in his discretion, to give and receive all notices, monies, approvals, and other documents and instruments, and to take any other action on behalf of Borrower. All actions by

the Authorized Representative shall be final and binding on Borrower. Borrower may appoint a new Authorized Representative with Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Lender may rely on the authority given to the Authorized Representative until actual receipt by Lender of a duly authorized resolution substituting a different person as the Authorized Representative whom Lender has previously approved. No more than one person shall serve as Authorized Representative at any given time.

### 4.4    Principal's Net Worth and Liquidity.

Until the date on which all principal, interest, fees, costs and expenses under the Loan Documents have been paid in full, the aggregate net worth of the Principals (calculated in accordance with the methodology used to prepare each Principal's certified financial statements dated September 26, 2006 previously delivered to Lender) shall be equal to or greater than Ten Million and 00/100 Dollars ($10,000,000), of which not less than an aggregate of Eight Hundred Thousand and 00/100 Dollars ($800,000.00) must be in bank deposits or other liquid assets. Each Principal's net worth shall be evidenced by the certified financial statements of Principal required to be delivered to Lender pursuant to Article 3, above. If requested, Borrower shall cause Principal to provide Lender with additional written evidence satisfactory to Lender of such net worth. Borrower's failure to cause Principal to comply with this Section 4.4 shall constitute a default hereunder.

### ARTICLE 5
### BORROWER'S REPRESENTATIONS AND WARRANTIES

### 5.1    Borrower's Representations and Warranties.

To induce Lender to execute this Agreement and perform its obligations hereunder, Borrower hereby represents and warrants to Lender as follows:

(a)    Borrower lawfully possesses and holds fee simple title to the Project, free and clear of all liens, claims, encumbrances, covenants, conditions and restrictions, security interest and claims of others, except only the Permitted Exceptions. Each of Borrower and Managing Member is a Single Purpose Entity.

(b)    Except as set forth in Exhibit G, there is no litigation or proceedings pending, or to the best of Borrower's knowledge threatened, against the Project, Borrower, or any Principal, which could, if adversely determined, cause a Material Adverse Change with respect to Borrower, Principal or the Project. Except as set forth in Exhibit F, there are no Environmental Proceedings and Borrower has no knowledge of any threatened Environmental Proceedings or any facts or circumstances which may give rise to any future Environmental Proceedings.

(c)    Borrower is a duly organized and validly existing limited liability company and is in good standing under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 301, Huntersville, NC 28078. Borrower is in good standing under the laws of the State of Delaware and is authorized to do business in the State of North Carolina. Borrower has full power and authority to execute, deliver and perform all Loan Documents to which Borrower is a party, and such execution, delivery and performance have

been duly authorized by all requisite action on the part of Borrower. The Loan Documents have each been duly executed and delivered and each constitutes the duly authorized, valid and legally binding obligation of Borrower and any Principal, as the case may be, enforceable against Borrower and any Principal, as the case may be, in accordance with their respective terms. Borrower uses no trade name(s) other than its actual name(s) set forth herein.

(d)    Managing Member is a limited liability company duly organized or formed, validly existing and in good standing under the laws of the State of North Carolina with its principal place of business at 16740 Birkdale Commons Parkway, Suite 301, Huntersville, NC 28078. The members of Borrower are as set forth in Exhibit I. Each officer of Borrower has full right, power and authority to execute the Loan Documents on behalf of Borrower. The members of Managing Member are as set forth in Exhibit J.

(e)    True and complete copies of the certificate of formation and limited liability company operating agreement creating Borrower, and all other documents creating and governing Borrower and any and all amendments thereto (collectively, the "**Organizational Documents**") have been furnished to Lender. There are no other agreements, oral or written, among any of the members of Borrower or Managing Member relating to Borrower, or Managing Member. The Organizational Documents were duly executed and delivered, are in full force and effect, and binding upon and enforceable in accordance with their terms. The Organizational Documents constitute the entire understanding among the members of Borrower or Managing Member relating to Borrower, and Managing Member, respectively. No breach exists under the Organizational Documents and no act has occurred and no condition exists which, with the giving of notice or the passage of time would constitute a breach under the Organizational Documents.

(f)    No consent, approval or authorization of or declaration, registration or filing with any Governmental Authority or nongovernmental person or entity, including any creditor, partner, or member of Borrower, is required in connection with the execution, delivery and performance of this Agreement or any of the other Loan Documents other than the recordation of the Mortgage and the filing of UCC Financing Statements, except for such consents, approvals or authorizations of or declarations or filings with any Governmental Authority or non-governmental person or entity where the failure to so obtain would not have an adverse effect on Borrower or any Principal or which have been obtained as of any date on which this representation is made or remade. Neither Borrower, nor any member in Borrower, nor any Principal is insolvent and there has been no: (i) assignment made for the benefit of the creditors of any of them; (ii) appointment of a receiver for any of them or for the property of any of them; or (iii) bankruptcy, reorganization, or liquidation proceeding instituted by or against any of them.

(g)    There is no default under this Agreement or the other Loan Documents, nor any condition, which, after notice or the passage of time or both, would constitute a default or an Event of Default under, said documents. In addition, Borrower is not in default under any contract, agreement or commitment to which it is a party. The execution, delivery and compliance with the terms and provisions of this Agreement and the other Loan Documents will not (i) to the best of Borrower's knowledge, violate any provisions of law or any applicable regulation, order or other decree of any court or governmental entity, or (ii) conflict or be

inconsistent with, or result in any default under, any contract, agreement or commitment to which Borrower is bound.  Borrower has delivered to Lender copies of any agreements (including Leases) between Borrower and any Affiliate related in any way to the Project and any other agreements or documents materially affecting the construction, use and operation of the Project or the construction of the Improvements thereon.

(h)     To Borrower's and each Principal's knowledge, except for actions in connection with a possible median in Highway 96, (1) no condemnation of any portion of the Project, (2) no condemnation or relocation of any roadways abutting the Project, and (3) no proceeding to deny access to the Project from any point or planned point of access to the Project, has commenced by any Governmental Authority.

(i)     The Project is situated in an area classified by the applicable zoning authorities as Commercial/Retail.

(j)     The use of the Project as a retail shopping center and when the construction of the Project is completed the contemplated accessory uses do not violate (i) any Laws (including subdivision, zoning, building, environmental protection and wetland protection Laws), or (ii) any building permits, covenants, conditions and restrictions of record, or agreements affecting the Project or any part thereof.  Neither the zoning authorizations, subdivision approvals or variances nor any other right to construct or to use the Project is to any extent dependent upon or related to any real estate other than the Land.  No building or other improvement encroaches upon any property line, building line, set back line, side yard line or any recorded or visible easement (or other easement of which Borrower is aware or has reason to believe may exist) with respect to the Project.  The Project is not situated in an area designated as having special flood hazards as defined by the Flood Disaster Protection Act of 1973, as amended, or as a wetland by any governmental entity having jurisdiction over the Project.  All Laws relating to the construction of the Improvements have been complied with and all Governmental Approvals required for the construction of the Project as contemplated by the Plans and this Agreement shall be obtained and listed on Exhibit H, and maintained in valid and effective status.  The Project is accessible through fully improved and dedicated roads, accepted for maintenance and public use by public authority having jurisdiction. The Project has adequate water, gas and electrical supply, storm and sanitary sewerage facilities, telephone facilities, other required public utilities, fire and police protection, and means of access between the Project and public highways; none of the foregoing will be foreseeably delayed or impeded by virtue of any requirements under any applicable Laws. The Project includes all property and rights that may be reasonably necessary or desirable to promote the present and any reasonable future beneficial uses and enjoyment thereof.  To the best of Borrower's knowledge, there are no, nor are there any alleged or asserted, violations of law, regulations, ordinances, codes, permits, licenses, declarations, covenants, conditions or restrictions of record, or other agreements relating to the Project, or the contemplated Improvements, or any part thereof.  Borrower shall not permit any Governmental Approvals issued in connection with the development of the Project (to the extent that any such permits or Governmental Approvals continue to remain necessary for the construction of the Project) to expire and will proceed with the development of the Project according to the plans approved by the Governmental Authorities and in compliance with any time schedules or time limits imposed by such Governmental Authorities.  In no event shall any portion of the construction be

performed in or on the Land unless all permits and Governmental Approvals required in connection with the performance of such portion of the construction are then in full force and effect. All Governmental Approvals must be legally valid and remain in full force and effect throughout the construction of the Project (or, to the extent applicable, such lesser time period as shall be required by such authorities and/or by applicable Law for the performance of the construction to which such Governmental Approvals relate). In the event that any of such Governmental Approvals or permits is invalidated, rescinded or suspended during such time period, Lender will not be obligated to make disbursements of Loan proceeds during the period that any invalidation, rescission or suspension continues. Borrower shall take all necessary steps to cause any such invalidated, rescinded or suspended permits and Governmental Approvals to be reinstated to full force and effect within thirty (30) days of their invalidation, rescission or suspension, as the case may be.

(k)     Except as contemplated with respect to brokerage commissions due in connection with the Leases, no brokerage fees or commissions are payable by or to any person in connection with this Agreement or the Loan to be disbursed hereunder other than McPhillips Commercial Realty.

(l)     All financial statements and other documents and information previously furnished by Borrower, any Principal or Managing Member to Lender in connection with the Loan are materially, complete and correct and fairly present on a consistent basis with the financial conditions of the subjects thereof for the immediately prior periods as of the respective dates thereof and do not fail to state any material fact necessary to make such statements or information not misleading, and no Material Adverse Change with respect to Borrower, Principal or Managing Member or the Project has occurred since the respective dates of such statements and information. Neither Borrower nor any Principal has any material liability, contingent or otherwise, not disclosed in such financial statements. Each Principal has delivered collateral value statements prepared on a basis that is to the best of Borrower's knowledge acceptable to Lender and certified as true and correct by such Principal.

(m)     The Project is (or as of January 1st on the year following the recording of the applicable subdivision plat) taxed separately without regard to any other property and for all purposes the Project may be mortgaged, conveyed and otherwise dealt with as an independent parcel. There are no unpaid or outstanding real estate or other taxes or assessments on or against the Project or any part thereof, except general real estate taxes for 2007 and subsequent years not yet due or payable. To Borrower's and Principal's knowledge, there is no pending or contemplated action pursuant to which any special assessment may be levied against any portion of the Project.

(n)     Except for Leases which have been provided to Lender, Borrower and its previous owners have not entered into any Leases, subleases or other arrangements for occupancy of space within the Project that are currently in effect. True, correct and complete copies of Borrower's form lease and all Leases, as amended, have been delivered to Lender. All Leases are in full force and effect. Neither Borrower nor any Tenant is in default under any Lease.