(o)     The proceeds of the Loan shall be used for proper business purposes.  The Loan is not being made for the purpose of purchasing or carrying "margin stock" within the meaning of Regulation T, U or X issued by the Board of Governors of the Federal Reserve System and no portion of the proceeds of the Loan shall be used in any manner that would violate such Regulations or otherwise violate the Securities Act of 1933 or the Securities Exchange Act of 1934, and Borrower agrees to execute all instruments necessary to comply with all the requirements of Regulation U of the Federal Reserve System.

(p)     Borrower is not a party in interest to any plan defined or regulated under ERISA, and the assets of Borrower are not "plan assets" of any employee benefit plan covered by ERISA or Section 4975 of the Internal Revenue Code.

(q)     None of Borrower, any member in Borrower, or Principal is or will be, and no legal or beneficial interest of a member in Borrower is or will be held, directly or indirectly, by a "foreign corporation", "foreign partnership", "foreign trust", "foreign estate", "foreign person", "affiliate" of a "foreign person" or a "United States intermediary" of a "foreign person" within the meaning of the Internal Revenue Code Sections 897, 1445 or 7701, the Foreign Investments in Real Property Tax Act of 1980, the International Investment and Trade Services Survey Act, the Agricultural Foreign Investment Disclosure Act of 1978, or the regulations promulgated pursuant to such Acts or any amendments to such Acts.

(r)     There has been no material damage or destruction of any part of the Project by fire or other casualty that has not been repaired.

(s)     None of Borrower, Managing Member or Principal, or any beneficial owner of Borrower or Principal, is currently listed in the OFAC Lists.

(t)     All statements set forth in the Recitals are true and correct.

Borrower agrees that all of the representations and warranties set forth above and elsewhere in this Agreement are true as of the date hereof, will be true at the Closing Date.  It shall be a condition precedent to the Closing Date and each subsequent disbursement, if any, that each of said representations and warranties is true and correct as of the Closing Date and the date of such requested disbursement.  Each disbursement of Loan proceeds and each accrual at interest under the Maximum Interest Accrual Account shall be deemed to be a reaffirmation by Borrower that each of the representations and warranties is true and correct as of the date of such disbursement.  In addition, at Lender's request, Borrower shall reaffirm such representations and warranties in writing prior to each disbursement hereunder, including with respect to any disbursement pursuant to the interest reserve or accrual under the Maximum Interest Accrual account as set forth in this Agreement.

## ARTICLE 6
## ENVIRONMENTAL MATTERS

6.1   **Environmental Representations and Warranties.**

Each Environmental Indemnitor hereby represents and warrants to Lender that (i) except

as specifically disclosed in the documents listed in <u>Exhibit F</u> attached hereto (the "**Environmental Documents**"), to the best of Environmental Indemnitor's knowledge, (a) except for materials used in de minimus quantities and in the ordinary course of maintenance, construction and operation (and in compliance with all Laws) of the Project, has been and is free of all Hazardous Material, and (b) no release of any Hazardous Material has occurred on, onto or about the Project; (ii) neither Borrower nor, to the best of Environmental Indemnitor's knowledge, any other person or entity, has ever caused or permitted any Hazardous Material to be placed, held, located or disposed of on, under, at or in a manner to affect the Project, or any part thereof, and the Project has never been used (whether by Borrower or, to the best of Environmental Indemnitor's knowledge, by any other person or entity) for any activities involving, directly or indirectly, the use, generation, treatment, storage, transportation, or disposal of any Hazardous Material except as disclosed in the Environmental Documents; (iii) that, except as specifically disclosed in the Environmental Documents, the Project currently complies, and will comply based on its anticipated use, with all Laws relating to Hazardous Material; (iv) to the best of Environmental Indemnitor's knowledge, in connection with the ownership, operation, and use of the Project, all necessary notices have been filed and all required permits, licenses and other authorizations have been obtained, including those relating to the generation, treatment, storage, disposal or use of Hazardous Material except as disclosed in the Environmental Documents; (v) to the best of Environmental Indemnitor's knowledge, there is no present, past or threatened investigation, inquiry or proceeding relating to the environmental condition of, or to events on or about, the Project except as disclosed in the Environmental Documents; (vi) to Environmental Indemnitor's knowledge, neither the Project nor Borrower is subject to any remedial obligations under any Laws relating to Hazardous Material, health or the environment; (vii) to Borrower's knowledge, there are no underground tanks, vessels, or similar facilities for the storage, containment or accumulation of Hazardous Material of any sort on, under or affecting the Project except as disclosed in the Environmental Documents; and (viii) it has not, nor will it, release or waive the liability of any previous owner or operator of the Land or any party or any party who may be potentially responsible for the presence of or removal of Hazardous Material from the Project, nor has it made promises of indemnification regarding Hazardous Material on the Project to any party, except as contained herein and in the Loan Documents.

**6.2    Environmental Covenants.**

Environmental Indemnitors shall:

(a)    comply, and cause all other persons on or occupying the Project to comply, with all Laws relating to Hazardous Material;

(b)    not install, use, generate, manufacture, store, treat, release or dispose of, nor permit the installation, use, generation, storage, treatment, release or disposal of, Hazardous Material on, under or about the Project except as specifically disclosed in the Environmental Documents and except for materials used in the ordinary course of maintenance and operation (and in compliance with all Laws) of Borrower's or any Tenant's business;

(c)     immediately advise Lender in writing of:  (i) any and all Environmental Proceedings; (ii) except for materials used in the ordinary course of maintenance and operation (and in compliance with all Laws) of the Project, the presence of any Hazardous Material on, under or about the Project of which Lender has not previously been advised in writing; (iii) any remedial action taken by, or on behalf of, any Environmental Indemnitor in response to any Hazardous Material on, under or about the Project or to any Environmental Proceedings of which Lender has not previously been advised in writing; (iv) the discovery by any Environmental Indemnitor of the presence of any Hazardous Material on, under or about any real property or bodies of water adjoining or in the vicinity of the Project; and (v) the discovery by any Environmental Indemnitor of any occurrence or condition on any real property adjoining or in the vicinity of the Project that could cause the Project or any part thereof to be subject to any restrictions on the ownership, occupancy, transferability or use of the Project under any Laws relating to Hazardous Material;

(d)     provide Lender with copies of all reports, analyses, notices, licenses, approvals, orders, correspondences or other written materials in its possession or control relating to the environmental condition of the Project or real property or bodies of water adjoining or in the vicinity of the Project or Environmental Proceedings immediately upon receipt, completion or delivery of such materials;

(e)     not install or allow to be installed any tanks for the storage of Hazardous Material on, at or under the Project, except for temporary above-ground tanks used in connection with the corrective actions described in the Environmental Documents;

(f)     not create or permit to continue in existence any lien (whether or not such lien has priority over the lien created by the Mortgage) upon the Project imposed pursuant to any Laws relating to Hazardous Material;

(g)     not change or alter the present use of the Project unless Environmental Indemnitors shall have notified Lender thereof in writing and Lender shall have determined, in its sole and absolute discretion, that such change or modification will not result in the presence of Hazardous Material on the Project in question in such a level that would increase the potential liability for Environmental Proceedings;

(h)     prior to construction of any Improvements, cause the groundwater well on the Property to be closed by a certified well driller in accordance with all Laws, and provide to Lender all documentation required for an abandoned well; and

(i)     during demolition at the Property, cause Soil & Environmental Consultants, PA to test for and remove any asbestos containing materials in accordance with all Laws.

6.3     **Right of Entry and Disclosure of Environmental Reports.**

Borrower hereby grants to Lender its agents, employees, consultants and contractors, an irrevocable license and authorization to enter upon and inspect the Project at reasonable times and upon reasonable advance notice, and conduct such environmental audits and tests, including, without limitation, subsurface testing, soils and groundwater testing, and other tests which may

physically invade the Project, which Lender, in its reasonable discretion, determines are necessary or desirable. With respect to invasive testing, such as soil borings, Lender shall consult with Borrower in advance of such tests. Lender agrees, however, that it shall not conduct any such audits or tests, unless a default exists under the Loan Documents or Lender has reason to believe that such audit or test may disclose the presence or release of Hazardous Material or unless an environmental audit deems further testing necessary. Without limiting the generality of the foregoing, Borrower agrees that Lender shall have the right to appoint a receiver to enforce this right to enter and inspect the Project to the extent such authority is provided under applicable law. All reasonable out-of-pocket costs and expenses incurred by Lender in connection with any inspection, audit or testing conducted in accordance with this Section 6.3 shall be paid by Borrower. The results of all investigations and reports prepared by Lender shall be and at all times remain the property of Lender and under no circumstances shall Lender have any obligation whatsoever to disclose or otherwise make available to Environmental Indemnitors or any other party such results or any other information obtained by it in connection with such investigations and reports; provided, however, that if there exists no Event of Default under the Loan Documents, if requested by Borrower, Lender shall provide to Borrower a copy of the written report with respect to any inspection, audit or testing for which Borrower has paid hereunder. Lender hereby reserves the right, and Environmental Indemnitors hereby expressly authorize Lender to make available to any party in connection with a sale of the Project any and all environmental reports related thereto, whether prepared by Lender or prepared by Borrower and provided to Lender (collectively, the "**Environmental Reports**"), which Lender may have with respect to the Project. Borrower consents to Lender notifying any party under such circumstances of the availability of any or all of the Environmental Reports and the information contained therein. Each Environmental Indemnitor further agrees that Lender may disclose such Environmental Reports to any governmental agency or authority if Lender reasonably believes that it is required to disclose any matter contained therein to such agency or authority; provided that Lender shall give Borrower at least 48 hours' prior written notice before so doing. Each Environmental Indemnitor acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the Environmental Reports, and that the release of the Environmental Reports, or any information contained therein, to prospective bidders at any foreclosure sale of the Project may have a material and adverse effect upon the amount, which a party may bid at such sale. Each Environmental Indemnitor agrees that Lender shall not have any liability whatsoever as a result of delivering any or all of the Environmental Reports or any information contained therein to any third party, and each Environmental Indemnitor hereby releases and forever discharges Lender from any and all claims, damages, or causes of action arising out of connected with or incidental to the Environmental Reports or the delivery thereof. If there has not been an Event of Default, Lender agrees to repair any damage to and restore the Project as a result of Lender exercising its rights under this paragraph.

6.4     **Environmental Indemnitor's Remedial Work.**

Environmental Indemnitors shall promptly perform, or with respect to any corrective actions described in the Environmental Documents, cause to be performed, any and all necessary remedial work ("**Remedial Work**") in response to any Environmental Proceedings or the presence, storage, use, disposal, transportation, discharge or release of any Hazardous Material on, under or about any of the Project; provided, however, that Borrower shall perform or cause to

be performed such Remedial Work so as to minimize any impairment to Lender's security under the Loan Documents.

All Remedial Work shall be conducted: (a) in a diligent and timely fashion by licensed contractors acting under the supervision of a consulting environmental engineer; (b) pursuant to a detailed written plan for the Remedial Work approved by any public or private agencies or persons with a legal or contractual right to such approval; (c) with such insurance coverage pertaining to liabilities arising out of the Remedial Work as is then customarily maintained with respect to such activities; and (d) only following receipt of any required permits, licenses or approvals. The selection of the Remedial Work contractors and consulting environmental engineer, the contracts entered into with such parties, any disclosures to or agreements with any public or private agencies or parties relating to Remedial Work and the written plan for the Remedial Work (and any changes thereto) shall each be subject to Lender's prior written approval, which shall not be unreasonably withheld or delayed. In addition, Environmental Indemnitors shall submit to Lender, promptly upon receipt or preparation, copies of any and all reports, studies, analyses, correspondence, governmental comments or approvals, proposed removal or other Remedial Work contracts and similar information prepared or received by Environmental Indemnitors in connection with any Remedial Work, or Hazardous Material relating to the Project. All costs and expenses of such Remedial Work shall be paid by Environmental Indemnitors, including, without limitation, the charges of the Remedial Work contractors and the consulting environmental engineer, any taxes or penalties assessed in connection with the Remedial Work and Lender's reasonable fees and out-of-pocket costs incurred in connection with monitoring or review of such Remedial Work. Lender shall have the right but not the obligation to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any Environmental Proceedings.

6.5     **Environmental Indemnity.**

Environmental Indemnitors shall protect, indemnify, defend and hold Lender and any participants, successors or assigns to Lender's interest in the Loan, and any other affiliate thereof who acquires any portion of the Loan at a foreclosure sale or otherwise through the exercise of Lender's rights and remedies under the Loan Documents, and all directors, officers, employees and agents of all of the aforementioned indemnified parties, harmless from and against any and all actual or potential claims, liabilities, damages (direct or indirect), and Expenses which arise out of or relate in any way to any breach of any representation, warranty or covenant contained herein, or any Environmental Proceedings or any use, handling, production, transportation, disposal, release or storage of any Hazardous Material in, under or on the Project, whether by any Environmental Indemnitor or any other person, including, without limitation:

(a)     all foreseeable and all unforeseeable Expenses (including any loss of principal and interest due and owing on the Loan) arising out of: (i) Environmental Proceedings or the use, generation, storage, discharge or disposal of Hazardous Material by Environmental Indemnitors, any prior owner or operator of the Project or any person on or about the Project; (ii) any residual contamination affecting any natural resource or the environment; or (iii) any exercise by Lender of any of its rights and remedies under this Article 6; and

(b)     the costs of any required or necessary investigation, assessment, testing, remediation, repair, cleanup, or detoxification of the Project and the preparation of any closure or other required plans.

Environmental Indemnitors' liability to the aforementioned indemnified parties shall arise upon the earlier to occur of (1) discovery of any Hazardous Material on, under or about the Project, or (2) the institution of any Environmental Proceedings, and not upon the realization of loss or damage, and Environmental Indemnitors shall pay to Lender from time to time, immediately upon request, an amount equal to such Expenses, as reasonably determined by Lender. In addition, in the event any Hazardous Material is removed, or caused to be removed from the Project, by Environmental Indemnitors, Lender or any other person, the number assigned by the U.S. Environmental Protection Agency to such Environmental Proceedings or any similar identification shall in no event be in the name of Lender or identify the Lender as a generator, arranger or other designation. The foregoing indemnity shall not include Expenses arising solely from Hazardous Material which first exist on the Project following the date on which the Lender (or its nominee) takes title to the Project, whether by foreclosure of the Mortgage, by a deed-in-lieu thereof or otherwise.

6.6     <u>Remedies Upon an Environmental Default.</u>

In addition to any other rights or remedies Lender may have under this <u>Article 6</u>, at law or in equity, in the event that Environmental Indemnitors shall fail to timely comply with any of the provisions of this <u>Article 6</u>, or in the event that any representation or warranty made in this <u>Article 6</u> proves to be false or misleading, then, in such event, after (i) delivering written notice to Environmental Indemnitors, which notice specifically states that Environmental Indemnitors have failed to comply with the provisions of this <u>Article 6</u>; and (ii) the expiration of the earlier to occur of (A) a thirty (30) day period after receipt of such notice and (B) the cure period, if any, permitted under any applicable law, rule, regulation or order with which Environmental Indemnitors shall have failed to comply, Lender may declare an Event of Default in this Agreement or any other Loan Documents and exercise any and all remedies provided for therein, and/or do or cause to be done whatever is reasonably necessary to cause the Project to comply with all Laws relating to Hazardous Material and other applicable Laws, rules, regulations or orders and the cost thereof shall constitute an Expense hereunder and shall become immediately due and payable without notice and with interest thereon at the Default Rate until paid. Environmental Indemnitors shall give to Lender and its agents and employees access to the Project for the purpose of effecting such compliance and hereby specifically grant to Lender a license, effective upon expiration of the applicable period as described above, if any, to do whatever is necessary to cause the Project to so comply, including, without limitation, to enter the Project and remove therefrom any Hazardous Material or otherwise comply with any Laws relating to Hazardous Material.

6.7     <u>Unconditional Environmental Obligations.</u>

Notwithstanding any term or provision contained herein or in the other Loan Documents, the covenants and obligations of the Environmental Indemnitors under this <u>Article 6</u> (the "**Environmental Obligations**") are unconditional. Environmental Indemnitors shall be fully,

personally, jointly and severally liable for the Environmental Obligations, and such liability shall not be limited to the original principal amount of the Loan. The Environmental Obligations shall be enforceable by Lender, its Affiliates, and its successors and assigns. The Environmental Obligations shall survive the repayment of the Loan and any foreclosure, deed-in-lieu or transfer in lieu of foreclosure or similar proceedings or any transfer of title to the Project or any portion thereof.

**6.8    Assignment of Environmental Obligations Prohibited.**

The Environmental Obligations may not be assigned or transferred, in whole or in part, by Environmental Indemnitors and any purported assignment by Environmental Indemnitors of the Environmental Obligations shall be void <u>ab initio</u> and of no force or effect.

**6.9    Indemnification Separate from the Loan.**

(a)    The Environmental Indemnitors agree that the Environmental Obligations are separate, independent of and in addition to the undertakings of the Environmental Indemnitors, as applicable, pursuant to the Loan, the Note, the other provisions of this Agreement and the other Loan Documents. A separate action may be brought to enforce the provisions of this <u>Article 6</u>, which shall in no way be deemed to be an action on the Note, whether or not the Loan has been repaid and whether or not Lender would be entitled to a deficiency judgment following a judicial foreclosure, trustee's sale or UCC sale. The Environmental Obligations shall not be affected by any exculpatory provisions contained in the Note, this Agreement or any of the other Loan Documents. All rights and obligations of this <u>Article 6</u> shall survive performance and repayment of the obligations evidenced by and arising under the Loan Documents, surrender of the Note, reconveyance of the Mortgage, release of other security provided in connection with the Loan, trustee's sale or foreclosure under the Mortgage and/or any of the other Loan Documents (whether by deed or other assignment in lieu of foreclosure, or otherwise acquisition of the Project by Lender, any other transfer of the Project, and transfer of all of Lender's rights in the Loan, the Loan Documents, and the Project.

(b)    Environmental Indemnitors waive all rights to require Lender to (i) proceed against or exhaust any security for the Loan or (ii) pursue any remedy in Lender's power whatsoever. Borrower waives all defenses by reason of any disability or other defense under the Loan or by reason of the cessation from any cause whatsoever of its liability under the Loan, or that it may acquire by reason of Lender's election of any remedy against it including, without limitation, Lender's exercise of its rights to foreclose under the Mortgage.

**ARTICLE 7**
**CASUALTIES AND CONDEMNATION**

**7.1    Lender's Election to Apply Insurance Proceeds on Indebtedness.**

(a)  Subject to the provisions of <u>Section 7.1(b)</u> below, Lender may elect to collect, retain and apply upon the Indebtedness of Borrower under this Agreement or any of the other Loan Documents all proceeds of insurance resulting from any loss at the Project or condemnation or other taking of the Project or a portion thereof (individually and collectively referred to as

"**Insurance Proceeds**") after deduction of all expenses of collection and settlement, including attorneys' and adjusters' fees and charges. Any proceeds remaining after repayment of the Indebtedness shall be paid by Lender to Borrower.

(b) Notwithstanding anything in <u>Section 7.1(a)</u> to the contrary, in the event of any casualty to the Improvements or any condemnation of part of the Project, Lender agrees to make available the Insurance Proceeds to restoration of the Improvements if (i) no Event of Default exists, (ii) all Insurance Proceeds are deposited with Lender, (iii) in Lender's reasonable judgment, the amount of Insurance Proceeds available for restoration of the Improvements plus Borrower's deductible is sufficient to pay the full and complete costs of such restoration, or if not sufficient, Borrower has deposited with Lender an amount, which together with the amount of the Insurance Proceeds available for restoration of the Improvements, in Lender's reasonable judgment, will be sufficient to pay the full and complete costs of such restoration, (iv) no material Leases (which for this purpose shall mean Leases demising more than five percent (5%) of the rentable square feet of space at the Project) in effect at the time of such casualty or condemnation are or will be terminated as a result of such casualty or condemnation, (v) the income from the Project (including any business interruption insurance proceeds) will not decrease more than five percent (5%) as a result of such casualty or condemnation, (vi) the cost of restoration will not exceed ten percent (10%) of the Loan Amount, (vii) in Lender's sole determination after completion of restoration the Loan Amount will not exceed seventy five percent (75%) of the fair market value of the Project, (viii) in Lender's reasonable determination, the Project can be restored to an architecturally and economically viable project in compliance with applicable Laws, (ix) Principal reaffirms in writing his obligations under the Limited Joinder and under any other guaranty to Lender, and (x) in Lender's reasonable determination, such restoration is likely to be completed not later than six (6) months prior to the Maturity Date.

**7.2     Borrower's Obligation to Rebuild and Use of Insurance Proceeds Therefor.**

In case Lender does not elect to apply or does not have the right to apply the Insurance Proceeds to the Indebtedness, as provided in <u>Section 7.1</u> above, Borrower shall:

(a) Proceed with diligence to make settlement with insurers or the appropriate Governmental Authorities and cause the Insurance Proceeds to be deposited with Lender;

(b) In the event of any delay in making settlement with insurers or the appropriate Governmental Authorities or effecting collection of the Insurance Proceeds, deposit with Lender the full amount required to complete construction as aforesaid;

(c) In the event the Insurance Proceeds and the available proceeds of the Loan are insufficient to assure Lender that all contemplated repairs or construction will be completed, promptly deposit with Lender any amount necessary to assure that such contemplated repairs or construction will be completed; and

(d) Promptly proceed with the assumption of construction of the Improvements, including the repair of all damage resulting from such fire, condemnation or other cause and restoration to its former condition.

Any request by Borrower for a disbursement by Lender of Insurance Proceeds and funds deposited by Borrower shall be treated by Lender as if such request were for a disbursement of the Loan hereunder, and the disbursement thereof shall be conditioned upon Borrower's compliance with and satisfaction of the same conditions precedent as would be applicable under this Agreement for a disbursement of the Loan.

## ARTICLE 8
## EVENTS OF DEFAULT AND REMEDIES

### 8.1     Events of Default.

The occurrence of any one or more of the following shall constitute an "**Event of Default**" as said term is used herein:

(a)     Failure of Borrower to pay the outstanding principal amount, all interest thereon and all other amounts owing hereunder or the other Loan Documents (the "**Indebtedness**") on the Maturity Date or the failure to pay, within five (5) days after the due date, any other payment obligations of Borrower to Lender, including any payments of interest, principal, Net Cash Flow, or Excess Cash Flow due pursuant to this Agreement;

(b)     Failure of Borrower to strictly comply with the provisions of Section 4.2(b) (transfers and change of control), Section 4.2(d) (insurance), Section 4.2(l) (no additional debt or encumbrances), Section 4.2(m) (organizational documents), Section 4.2(n) (single purpose entity), and Article 6 (environmental matters);

(c)     Failure of Borrower for a period of thirty (30) days after written notice from Lender, to observe or perform any non-monetary covenant or condition contained in this Agreement or any other Loan Documents not set forth in the subsections above; provided that if any such failure concerning a non-monetary covenant or condition is susceptible to cure and cannot reasonably be cured within said thirty (30) day period, then Borrower shall have an additional sixty (60) day period to cure such failure and no Event of Default shall be deemed to exist hereunder so long as (Y) Borrower commences such cure within the initial thirty (30) day period and diligently and in good faith pursues such cure to completion within such resulting ninety (90) day period from the date of Lender's notice, and (Z) the existence of such default will not result in any Tenant having the right to terminate its Lease due to such default; and provided further that if a different notice or grace period is specified under any other subsection of this Section 8.1 with respect to a particular breach, or if another subsection of this Section 8.1 applies to a particular breach and does not expressly provide for a notice or grace period, the specific provision shall control;

(d)     Any material default by Borrower, as lessor, under the terms of any Lease following the expiration of any applicable notice and cure period, provided that if the Lease does not provide a notice and cure period, then the notice and cure period provided in (a) above will apply to any monetary default, and the notice and cure period provided in (c) will apply to any non-monetary default (which respective periods shall commence upon written notice of default from Lender or the applicable Tenant, whichever occurs first);

(e)     If any warranty, representation, statement, report or certificate made now or hereafter by Borrower or any Principal is untrue or incorrect in any material respect at the time made or delivered, provided that if such breach is reasonably susceptible of cure, then no Event of Default shall exist so long as the applicable party cures said breach (i) by the due date provided in (a) above for a breach that can be cured by the payment of money or (ii) within the notice and cure period provided in (c) above for any other breach;

(f)     A petition under any Chapter of Title 11 of the United States Code or any similar law or regulation is filed by or against Borrower Managing Member, or any Principal (and in the case of an involuntary petition in bankruptcy, such petition is not discharged within sixty (60) days after its filing), or a custodian, receiver or trustee for any of the Project is appointed, or Borrower, Managing Member, or any Principal makes an assignment for the benefit of creditors, or any of them are adjudged insolvent by any state or federal court of competent jurisdiction, or any of them admit their insolvency or inability to pay their debts as they become due or an attachment or execution is levied against any of the Project;

(g)     The occurrence of any other event or circumstance denominated as an Event of Default herein or under any of the other Loan Documents and the expiration of any applicable grace or cure periods, if any, specified for such Event of Default herein or therein, as the case may be.

(h)     The failure by Borrower (i) to have obtained all permits required for construction and completion of the Project and for utility service to the Project, including without limitation any permits as are described on Exhibit H, within sixty (60) days of the date hereof, or (ii) to have furnished Lender with a final site plan and with the final Plans for the Project, which site plan and Plans shall have been approved by all Governmental Authorities having jurisdiction thereover, by April 1, 2007.

**8.2     Remedies Conferred Upon Lender.**

Lender's rights, remedies and powers, as provided herein and the other Loan Documents, are cumulative and concurrent, and may be pursued singly, successively or together against Borrower, any guarantor of the Loan, the security described in the Loan Documents, and any other security given at any time to secure the payment hereof, all at the sole discretion of Lender. Additionally, Lender may resort to every other right or remedy available at law or in equity without first exhausting the rights and remedies contained herein, all in Lender's sole discretion. Failure of Lender, for any period of time or on more than one occasion, to exercise its option to accelerate the Maturity Date shall not constitute a waiver of the right to exercise the same at any time during the continued existence of any Event of Default or any subsequent Event of Default. At any time after the occurrence of any Event of Default, Lender may pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that none of such remedies shall be to the exclusion of any other:

(a)     Take possession of the Project and do anything that is necessary or appropriate in its sole judgment to fulfill the obligations of Borrower under this Agreement and the other Loan Documents. Without restricting the generality of the foregoing and for the purposes aforesaid,

Borrower hereby appoints and constitutes Lender its lawful attorney-in-fact with full power of substitution in the Project to use undisbursed portion of the Holdback or portion of the Loan which may be reserved, escrowed or set aside for any purposes hereunder at any time, or to advance funds in excess of the face amount of the Note, to pay, settle or compromise all existing bills and claims, which may be liens or security interests, or to avoid such bills and claims becoming liens against the Project; to execute all applications and certificates in the name of Borrower to prosecute and defend all actions or proceedings in connection with the Improvements or Project; and to do any and every act which the Borrower might do in its own behalf; it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked;

(b)     Declare the Note or the Indebtedness to be immediately due and payable;

(c)     Use and apply any monies or letters of credit deposited by Borrower with Lender, regardless of the purposes for which the same was deposited, to cure any such default or to apply on account of any Indebtedness under this Agreement which is due and owing to Lender; and

(d)     Exercise or pursue any other remedy or cause of action permitted under this Agreement or any other Loan Documents, or conferred upon Lender by operation of Law.

Notwithstanding the foregoing, upon the occurrence of any Event of Default under Section 8.1(f) all amounts evidenced by the Note shall automatically become due and payable, without any presentment, demand, protest or notice of any kind to Borrower.

## ARTICLE 9
## LOAN EXPENSE, COSTS AND ADVANCES

### 9.1     Loan and Administration Expenses.

Borrower unconditionally agrees to pay all costs and expenses of the Loan, including all amounts payable pursuant to Sections 2.7, 2.8 and 9.2 and any and all other fees owing to Lender pursuant to the Loan Documents, and also including all documentation, modification, or workout costs relating to the Loan, recording, filing and registration fees and charges, mortgage or documentary taxes, UCC searches, title and survey charges, all fees and disbursements of Lender's consultants, any costs involved in the disbursement, syndication and administration of the Loan, any repair or maintenance costs or payments made to remove or protect against liens, all costs and expenses incurred by Lender in connection with the determination of whether or not Borrower has performed the obligations undertaken by Borrower hereunder or has satisfied any conditions precedent to the obligations of Lender hereunder and, if any default or Event of Default occurs hereunder or under any of the Loan Documents or if the Loan or Note or any portion thereof is not paid in full when and as due, all costs and expenses of Lender incurred in attempting to enforce or collect payment of the Loan or enforce any rights of Lender or Borrower's obligations hereunder and expenses of Lender incurred (including expenses relating to documentary and expert evidence, publication costs) in attempting to realize, while a default or Event of Default exists, on any security or incurred in connection with the sale, disposition (or preparation for sale or disposition) or liquidation of any security for the Loan (including any

foreclosure sale, deed in lieu transaction or costs incurred in connection with any litigation or bankruptcy or administrative hearing and any appeals therefrom and any post-judgment enforcement action including, without limitation, supplementary proceedings in connection with the enforcement of this Agreement). All such costs or expenses incurred or advances or payments made by Lender shall also include court costs, legal fees and disbursements relating thereto and shall be included as additional Indebtedness evidenced by the Note and secured by the Mortgage and the other Loan Documents bearing interest at the Default Rate set forth in the Note until paid. Borrower agrees to pay all brokerage, finder or similar fees or commissions payable in connection with the transactions contemplated hereby and shall indemnify, defend and hold Lender harmless against all claims, liabilities, and Expenses arising in relation to any claim by broker, finder or similar person. Lender may require the payment of Lender's outstanding fees and expenses as a condition to any disbursement of the Loan. Lender is hereby authorized, without any specific request or direction by Borrower, to make disbursements from time to time in payment of or to reimburse Lender for all Loan expenses and fees.

**9.2    Right of Lender to Make Advances to Cure Borrower's Defaults.**

In the event that Borrower fails to perform any of Borrower's covenants, agreements or obligations contained in this Agreement or any of the other Loan Documents (after the expiration of applicable grace periods, except in the event of an emergency or other exigent circumstances), Lender may (but shall not be required to) perform any of such covenants, agreements and obligations, and any amounts expended by Lender in so doing and shall constitute additional Indebtedness evidenced by the Note and secured by the Mortgage and the other Loan Documents and shall bear interest at a rate per annum equal to the Interest Rate (or Default Rate following an Event of Default).

**9.3    Increased Costs.**

Borrower agrees to pay Lender additional amounts to compensate Lender for any increase in its actual costs incurred in maintaining the Loan or any portion thereof outstanding or for the reduction of any amounts received or receivable from Borrower as a result of any change after the date hereof in any applicable Law, regulation or treaty, or in the interpretation or administration thereof, or by any domestic or foreign court, changing the basis of taxation of payments under this Agreement to Lender (other than taxes imposed on or measured by the net income or receipts of Lender or any franchise tax imposed on Lender). Any amount payable by Borrower under this Article 9 shall be paid within five (5) days of receipt by Borrower of a notice by Lender setting forth the amount due and the basis for the determination of such amount, which statement shall be conclusive and binding upon Borrower, absent manifest error. Failure on the part of Lender to demand payment from Borrower for any such amount attributable to any particular period shall not constitute a waiver of Lender's right to demand payment of such amount for any subsequent or prior period.

**9.4    Borrower Withholding.**

If by reason of a change in any applicable Laws occurring after the date hereof, Borrower is required by Law to make any deduction or withholding in respect of any taxes (other than taxes

imposed on or measured by the net income of or receipts of Lender or any franchise tax imposed on Lender), duties or other charges from any payment due under the Note, the sum due from Borrower in respect of such payment shall be increased to the extent necessary to ensure that, after the making of such deduction or withholding, Lender receives and retains a net sum equal to the sum which it would have received had no such deduction or withholding been required to be made.

9.5    **Document and Recording Tax Indemnification.**

Borrower agrees to indemnify, defend and hold harmless Lender from and against any claim that any documentary or mortgage tax is due and payable in connection with the Loan or the execution, delivery or recording of the Loan Documents and to pay such taxes and Expenses incurred by Lender in connection therewith. Borrower may contest any determination that any such taxes are due, but shall pay any such taxes (including penalties and interest) when legally required. This paragraph shall survive repayment of the Loan.

**ARTICLE 10**
**ASSIGNMENTS BY LENDER AND DISCLOSURE**

10.1    **Assignments and Participations.**

Lender may from time to time, without the consent of Borrower, sell, transfer, pledge, assign and convey the Note, the Loan and the Loan Documents (or any interest therein), and any and all servicing rights with respect thereto, and may grant participations in the Loan and split the Loan into multiple parts, or the Note into multiple component notes or tranches, that may have different financial terms provided that such terms, when taken together, are economically equivalent to the original Loan or Note. Borrower agrees, at Lender's expense, to cooperate with Lender's efforts to do any of the foregoing and to execute all documents reasonably required by Lender in connection therewith, including, without limitation, amendments to the Loan Documents. In connection with any such sale, transfer, assignment, conveyance or participation, Lender may, acting for this purpose as an agent of Borrower, maintain at its offices a register for the recordation of the names and addresses of Lender's participants or assignees, and the amount and terms of Lender's sales, transfers, assignments, conveyances and participations including specifying any such participant's or assignee's entitlement to payments of principal and interest, and any payments made, with respect to each such sale, transfer, assignment, conveyance or participation.

10.2    **Disclosure of Information and Confidentiality.**

Lender shall have the right (but shall be under no obligation) to make available to (i) agents, employees, Affiliates, attorneys, advisors of Lender and any regulator, Governmental Authority and (ii) prospective transferees, participants or purchasers of any interest in the Loan (including any prospective bidder at any foreclosure sale of the Project), any and all information that Lender may have with respect to the Project, Borrower or any Principal whether provided by such person or any third party, including, without limitation, (A) as required by law, regulation, rule, request or order, subpoena, judicial order or similar order and in connection with any litigation and (B) as may be required in connection with the examination, audit or similar

investigation of such person, *provided,* that Lender exercise the same degree of care that it exercises with respect to its own proprietary information to maintain the confidentiality of any confidential information thereby received or received with respect to the Project, Borrower, or any Principal.  Confidential information shall include only such information identified as such at the time provided to Lender and shall not include information that either: (i) is in the public domain, or becomes part of the public domain after disclosure to such person through no fault of such person or (ii) is disclosed to such person by a third party (including information obtained as a result of any environmental assessments), *provided* Lender does not have actual knowledge that such third party is prohibited from disclosing such information. Borrower and each Principal agree that Lender shall have no liability whatsoever as a result of delivering any such information to any third party as described above, and Borrower and any Principal, on behalf of themselves and their successors and assigns, hereby release and discharge Lender from any and all liability, claims, damages, or causes of action, arising out of, connected with or incidental to the delivery of any such information to any third party.

### ARTICLE 11
### GENERAL PROVISIONS

**11.1**   <u>Captions.</u>

The captions and headings of various Articles, Sections and subsections of this Agreement and the other Loan Documents and the Exhibits and Schedules pertaining thereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof or thereof.

**11.2**   <u>Waiver of Jury Trial.</u>

TO THE GREATEST EXTENT PERMITTED BY LAW, BORROWER, LENDER AND PRINCIPAL EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY CLAIM, CONTROVERSY DISPUTE, ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (INCLUDING WITHOUT LIMITATION ANY ACTIONS OR PROCEEDINGS FOR ENFORCEMENT OF THE LOAN DOCUMENTS) AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  BORROWER, LENDER AND PRINCIPAL EACH ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH OF THEM HAS RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THAT EACH OF THEM WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS.  BORROWER, LENDER AND PRINCIPAL EACH WARRANT AND REPRESENT THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

### 11.3    Jurisdiction.

TO THE GREATEST EXTENT PERMITTED BY LAW, BORROWER AND EACH PRINCIPAL HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALLING OF ASSETS BY LENDER.  WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS AGREEMENT (EACH, A "**PROCEEDING**"), BORROWER AND EACH PRINCIPAL IRREVOCABLY (A) SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN THE CITY OF CHICAGO, COUNTY OF COOK AND STATE OF ILLINOIS, AND (B) WAIVE ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVE ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVE THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY. NOTHING IN THIS AGREEMENT SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION.  BORROWER AND EACH PRINCIPAL HEREBY WAIVE PERSONAL SERVICE OF ANY AND ALL PROCESS AND FURTHER AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY ILLINOIS STATE OR UNITED STATES COURT SITTING IN THE CITY OF CHICAGO AND COUNTY OF COOK MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO BORROWER OR, AS APPLICABLE, TO EACH PRINCIPAL, AT THE ADDRESS INDICATED BELOW AND AT THE ADDRESS ON THE ATTACHED LIMITED JOINDER (AS APPLICABLE), AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; EXCEPT THAT IF BORROWER OR SUCH PRINCIPAL SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.

### 11.4    Governing Law.

Irrespective of the place of execution and/or delivery, this Agreement and the other Loan Documents shall be governed by, and shall be construed in accordance with, the internal laws of the State of Illinois, without regard to conflicts of law principles except as provided in the Mortgage.

### 11.5    Lawful Rate of Interest.

In no event whatsoever shall the amount of interest paid or agreed to be paid to Lender pursuant to this Loan Agreement, the Note or any of the Loan Documents exceed the highest lawful rate of interest permissible under applicable law.  If, from any circumstances whatsoever, fulfillment of any provision of this Loan Agreement, the Note and the other Loan Documents shall involve exceeding the lawful rate of interest which a court of competent jurisdiction may deem applicable hereto ("**Excess Interest**"), then ipso facto, the obligation to be fulfilled shall be

reduced to the highest lawful rate of interest permissible under such law and if, for any reason whatsoever, Lender shall receive, as interest, an amount which would be deemed unlawful under such applicable law, such interest shall be applied to the Loan (whether or not due and payable), and not to the payment of interest, or refunded to Borrower if such Loan has been paid in full. Neither Borrower nor any guarantor, endorser or surety nor their heirs, legal representatives, successors or assigns shall have any action against Lender for any damages whatsoever arising out of the payment or collection of any such Excess Interest.

**11.6   Modification; Consent.**

No modification, waiver, amendment or discharge of this Agreement or any other Loan Document shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment or discharge is sought.  Consent by Lender to any act or omission by Borrower shall not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Lender's consent to be obtained in any future or other instance.

**11.7   Waivers; Acquiescence or Forbearance Not to Constitute Waiver of Lender's Requirements.**

(a)     Borrower for itself and all endorsers, guarantors and sureties and their heirs, legal representatives, successors and assigns, (i) waives presentment for payment, demand, notice of nonpayment or dishonor, protest of any dishonor, protest and notice of protest and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of the Loan; (ii) waives and renounces all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension, redemption, appraisement, or exemption and homestead laws now provided, or which may hereafter be provided, by the laws of the United States and of any state thereof against the enforcement and collection of the obligations evidenced by the Note or this Loan Agreement or as a bar to the enforcement of the lien created by any of the Loan Documents.

(b)     Borrower for itself and all endorsers, guarantors and sureties and their heirs, legal representatives, successors and assigns, (i) agrees that its liability shall not be in any manner affected by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Lender; (ii) consents to any indulgences and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions of this Loan Agreement, the Note, and to any substitution, exchange or release of the collateral, or any part thereof, with or without substitution, and agrees to the addition or release of any borrowers, endorsers, guarantors, or sureties, whether primarily or secondarily liable, without notice to Borrower and without affecting its liability hereunder; (iii) agrees that its liability shall be unconditional and without regard to the liability of any other person or entity; and (iv) expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing.

BOI 15806693.8 / 37050-000001

(c)     Each and every covenant and condition for the benefit of Lender contained in this Agreement and the other Loan Documents may be waived by Lender, provided, however, that to the extent that Lender may have acquiesced in any noncompliance with any requirements or conditions precedent to the closing of the Loan or to any subsequent disbursement of Loan proceeds, such acquiescence shall not be deemed to constitute a waiver by Lender of such requirements with respect to any future disbursements of Loan proceeds and Lender may at any time after such acquiescence require Borrower to comply with all such requirements.  Any forbearance by Lender in exercising any right or remedy under any of the Loan Documents, or otherwise afforded by applicable law, including any failure to accelerate the Maturity Date shall not be a waiver of or preclude the exercise of any right or remedy nor shall it serve as a novation of the Note or as a reinstatement of the Loan or a waiver of such right of acceleration or the right to insist upon strict compliance of the terms of the Loan Documents.  Lender's acceptance of payment of any sum secured by any of the Loan Documents after the due date of such payment shall not be a waiver of Lender's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment.  The procurement of insurance or the payment of taxes or other liens or charges by Lender shall not be a waiver of Lender's right to accelerate the maturity of the Loan, nor shall Lender's receipt of any awards, proceeds, or damages under Article 7 of this Agreement operate to cure or waive Borrower's or any Principal's default in payment of sums secured by any of the Loan Documents.

**11.8    Disclaimer by Lender.**

This Agreement and the other Loan Documents are made for the sole benefit of Borrower and Lender, and no other person or persons shall have any benefits, rights or remedies under or by reason of this Agreement or the other Loan Documents, or by reason of any actions taken by Lender pursuant to this Agreement or the other Loan Documents.  Lender shall not be liable to any contractors, subcontractors, supplier, architect, engineer, Tenant or other party for labor or services performed or materials supplied in connection with the Project.  Lender shall not be liable for any debts or claims accruing in favor of any such parties against Borrower or others or against the Project.  Lender neither undertakes nor assumes any responsibility or duty to Borrower to select, review, inspect, supervise, pass judgment upon or inform Borrower of any matter in connection with the Project.  Borrower shall rely entirely upon its own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information to Borrower by Lender in connection with such matters is for the protection of Lender only, and neither Borrower nor any third party is entitled to rely thereon.

**11.9    Partial Invalidity; Severability.**

If any of the provisions of this Agreement or the other Loan Documents, or the application thereof to any person, party or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the other Loan Documents, or the application of such provision or provisions to persons, parties or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law and to this end, the provisions of this Agreement and all the other Loan Documents are declared to be

severable.  All covenants and agreements of Borrower and each Principal shall be joint and several.

**11.10  Definitions Include Amendments.**

Definitions contained in this Agreement which identify documents, including, but not limited to, the Loan Documents, shall be deemed to include all amendments and supplements to such documents from the date hereof, and all future amendments, modifications, and supplements thereto entered into from time to time to satisfy the requirements of this Agreement or otherwise with the consent of Lender.  Reference to this Agreement contained in any of the foregoing documents shall be deemed to include all amendments and supplements to this Agreement.

**11.11  Execution in Counterparts.**

This Agreement and the other Loan Documents may be executed in any number of counterparts and by different parties hereto or thereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**11.12  Entire Agreement.**

This Agreement, taken together with all of the other Loan Documents and all certificates and other documents delivered by Borrower to Lender, embody the entire agreement and supersede all prior commitments, agreements, representations, and understandings, written or oral, relating to the subject matter hereof, and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto.

**11.13  Waiver of Damages.**

In no event shall Lender be liable to Borrower for punitive, exemplary or consequential damages, including, without limitation, lost profits, whatever the nature of a breach by Lender of its obligations under this Agreement or any of the Loan Documents, and Borrower for itself and its Principals waives all claims for punitive, exemplary or consequential damages.

**11.14  Claims Against Lender.**

Lender shall not be in default under this Agreement, or under any other Loan Documents, unless a written notice specifically setting forth the claim of Borrower shall have been given to Lender within three (3) months after Borrower first had knowledge of the occurrence of the event which Borrower alleges gave rise to such claim and Lender does not remedy or cure the default, if any there be, promptly thereafter.  Borrower waives any claim, set-off or defense against Lender arising by reason of any alleged default by Lender as to which Borrower does not give such notice timely as aforesaid.  Borrower acknowledges that such waiver is or may be essential to Lender's ability to enforce its remedies without delay and that such waiver therefore constitutes a substantial part of the bargain between Lender and Borrower with regard to the

Loan. No Principal or Tenant is intended to have any rights as a third-party beneficiary of the provisions of this Section 11.14.

**11.15   Set-Offs.**

After the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably authorizes and directs Lender from time to time to charge Borrower's accounts and deposits with Lender (or its Affiliates), and to pay over to Lender an amount equal to any amounts from time to time due and payable to Lender hereunder, under the Note or under any other Loan Document. Borrower hereby grants to Lender a security interest in and to all such accounts and deposits maintained by the Borrower with Lender (or its Affiliates).

**11.16   Relationship.**

The relationship between Lender and Borrower shall be that of creditor-debtor only. No term in this Agreement or in the other Loan Documents and no course of dealing between the parties shall be deemed to create any relationship of agency, partnership or joint venture or any fiduciary duty by Lender to Borrower or any other party.

**11.17   Agents.**

In exercising any rights under the Loan Documents or taking any actions provided for therein, Lender may act through its employees, agents or independent contractors as authorized by Lender.

**11.18   Interpretation.**

With respect to all Loan Documents, whenever the context requires, all words used in the singular will be construed to have been used in the plural, and vice versa, and each gender will include any other gender. The word "obligations" is used in its broadest and most comprehensive sense, and includes all primary, secondary, direct, indirect, fixed and contingent obligations. It further includes all principal, interest, prepayment charges, late charges, loan fees and any other fees and charges accruing or assessed at any time, as well as all obligations to perform acts or satisfy conditions. No listing of specific instances, items or matters in any way limits the scope or generality of any language in the Loan Documents. This Agreement and all of the other Loan Documents shall not be construed more strictly against one party than against the other, merely by virtue of the fact that it may have been prepared primarily by counsel for one of the parties.

**11.19   Successors and Assigns.**

Subject to the restrictions on transfer and assignment contained in Section 4.2(b) of this Agreement, this Agreement and the other Loan Documents shall inure to the benefit of and shall be binding on Lender, Borrower and Principal and their respective heirs, successors and permitted assigns.

**11.20** **Time is of the Essence**.

Borrower agrees that time is of the essence under this Agreement and the other Loan Documents and the performance of each of the covenants and agreements contained herein and therein.

**11.21** **Notices**.

Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (a) if hand delivered, when delivered; (b) if mailed by United States Certified Mail (postage prepaid, return receipt requested), three (3) Business Days after mailing (c) if by any reliable overnight courier service, on the next Business Day after delivered to such courier service or (d) if by telecopier on the day of transmission if before 3:00 p.m. (Chicago time) on a Business Day so long as copy is sent on the same day by overnight courier as set forth below:

    If to Borrower:

        Gemini Youngsville Crossing, LLC
        16740 Birkdale Commons Parkway, Suite 301
        Huntersville, NC  28078
        Attention:  Dante Massaro
        Telephone: 704-895-7846
        Facsimile: 704-895-7845 ext. 101

    and to:

        71 W. 12th Street, Unit 64
        New York, New York 10011
        Attention:  William Obeid

    With a copy to:
        Johnston, Allison & Hord, P.A.
        1065 East Morehead Street
        Charlotte, NC  28204
        Attention:  John R. Buben, Jr.
        Telephone: 704-332-1181
        Facsimile:    704-376-1628

BOI 15806693.8 / 37050-000001

If to Lender:

      Merrill Lynch Capital, a Division
      of Merrill Lynch Business Financial
      Services Inc.
      222 North LaSalle Street – 16th Floor
      Chicago, Illinois 60601
      Attention:  National Portfolio Manager -- Real Estate
      Telephone:  312-499-3140
      Facsimile:  312-499-3026

With a copy to:

      Merrill Lynch Capital, a Division
      of Merrill Lynch Business Financial
      Services Inc.
      222 North LaSalle Street – 16th Floor
      Chicago, Illinois 60601
      Attention:  Real Estate Legal
      Telephone:  312-269-4501
      Facsimile:  312-428-4046

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.  Any notice or demand delivered to the person or entity named above to accept notices and demands for such party shall constitute notice or demand duly delivered to such party, even if delivery is refused.

**11.22  Attorney's Fees.**

Notwithstanding anything to the contrary contained in the Loan Agreement and other Loan Documents, "legal fees," "attorney's fees," "reasonable attorney's fees" and similar expressions shall mean the amount actually charged by attorneys (based on time actually spent as standard hourly rates) retained by Lender in exercising Lender's rights under the Loan Documents.

*[signatures on following page]*

EXECUTED as of the date first set forth above.

BORROWER:

GEMINI YOUNGSVILLE CROSSING, LLC,
a Delaware limited liability company

By:    Gemini Youngsville Crossing Manager, LLC,
a North Carolina limited liability company,
its Manager

By:    Gemini Real Estate Advisors, LLC,  a
Delaware limited liability company, Manager

By: _____
/Manager

**LENDER:**

**MERRILL LYNCH CAPITAL**, a Division of
Merrill Lynch Business Financial Services Inc., a
Delaware corporation

By: _____

Name: ___Stacey Watson___

Title: ___Assistant/Vice President___

51

## LIMITED JOINDER

In order to induce Lender to make the Loan, each of the undersigned Principals has agreed to enter into this Limited Joinder in connection with that certain Loan Agreement (the "**Loan Agreement**") dated February 14, 2007 between Gemini Youngsville Crossing, LLC, a Delaware limited liability company ("**Borrower**"), and MERRILL LYNCH CAPITAL, a Division of Merrill Lynch Business Financial Services Inc., a Delaware corporation (collectively, with its successors and assigns, "**Lender**") (all capitalized terms not otherwise defined herein shall have the meanings set forth in the Loan Agreement). Each Principal acknowledges that without this Limited Joinder, Lender would be unwilling to make the Loan.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby agree and covenant as follows:

1. **Retained Liabilities**. Except for the Retained Liabilities (defined below) and the obligations, if any, of any Principal under any separate guaranty provided to Lender in connection with the Loan, no Principal shall be personally liable to pay the Loan, or any other amount due, or to perform any obligation, under the Loan Documents, and Lender agrees to look solely to all revenue and assets of Borrower, the Project and any other collateral heretofore, now, or hereafter pledged by any party to secure the Loan. The obligations of each Principal hereunder are separate and independent obligations and are not secured by the grant or pledge by Borrower pursuant to the Mortgage. This Limited Joinder is a guaranty of full and complete payment and performance and not of collectability. Each Principal, jointly and severally, shall be personally liable for the following (the "**Retained Liabilities**"):

(a)    all losses, damages, causes of actions, suits and Expenses incurred by Lender or any Affiliate or agent thereof as a result of (i) any failure after the occurrence and during the continuance of any default (without benefit of any applicable grace or cure period) to apply any portion of the revenue from the Project to the Loan as required per the Loan Agreement or to customary operating expenses of the Project, (ii) fraud, (iii) misapplication, misappropriation or conversion of any rents, proceeds or funds deriving from (A) the Project, (B) any insurance proceeds paid by reason of any loss, damage or destruction to the Project and not used by Borrower for restoration or repair of the Project; and/or (C) any awards or amounts received in connection with condemnation of all or a portion of the Project and not used by Borrower for restoration or repair of the Project, (iv) material misrepresentation, (v) any material waste or abandonment of the Project, (vi) failure to keep the Project insured in accordance with the terms of the Loan Documents, (vii) any fees paid to a Principal or any Affiliate after any default under the Loan Documents, and (viii) any breach of the Environmental Obligations or any representation or warranty contained in Article 6 of the Loan Agreement (Environmental Matters);

(b)    repayment of the Loan and the Exit Fee, all costs and expenses of Lender, and all other obligations of Borrower under the Loan Documents in the event of (i) any breach of any of the following covenants of the Loan Agreement in (A) Section 4.2(b) (transfers and change of control), (B) Section 4.2(l) (no additional debt or encumbrances), (C) Section 4.2(m)

(organizational documents), or (D) <u>Section 4.2(n)</u> (single purpose entity), or (ii) the filing by Borrower, or the filing against Borrower by any Principal or any Affiliate of any Principal, of any proceeding for relief under any federal or state bankruptcy, insolvency or receivership laws or any assignment for the benefit of creditors made by Borrower;

      (c)    repayment of the Guaranteed Amount, provided that this section (c) shall not be applicable in the event that, within eighteen (18) months of the Closing Date, (i) Leases for an aggregate of forty eight percent (48%) of the net rentable square footage of the Project shall have been executed by Borrower <u>and</u> (ii) Lender shall have received not less than Five Million Six Hundred Twenty Three Thousand Seven Hundred Twenty Three and 00/100 Dollars ($5,623,723.00) from the sale of the Release Parcels pursuant to the terms of the Loan Agreement; and

      (d)    repayment of the Loan, until such time as the Building Permits have been obtained.

The liability of each Principal shall be direct and immediate as a primary and not a secondary obligation or liability, and is not conditional or contingent upon the pursuit of any remedies against Borrower, or any other Principal or any other person, or against any collateral or liens held by Lender. The foregoing shall in no way limit or impair the enforcement against the Borrower, Project or any other collateral security granted by the Loan Documents of any of the Lender's rights and remedies pursuant to the Loan Documents.

      2.    <u>Waivers</u>. To the fullest extent permitted by applicable law, each Principal waives all rights and defenses of sureties, guarantors, accommodation parties and/or co-makers and agrees that its obligations under this Joinder shall be direct, primary, absolute and unconditional and that its obligations under this Joinder shall be unaffected by any of such rights or defenses, including,

      (a)    Any rights which it may have to require that (1) Lender first proceed against Borrower, any other Principal or any other person or entity with respect to the Retained Liabilities or (2) Lender first proceed against any collateral held by Lender or (3) any party to be joined in any proceeding to enforce the Retained Liabilities;

      (b)    The incapacity, lack of authority, death or disability of Borrower, any Principal or any other person or entity;

      (c)    The failure of Lender to commence an action against Borrower or any other person or entity or to proceed against or exhaust any security held by Lender at any time or to pursue any other remedy whatsoever at any time;

      (d)    Any duty on the part of Lender to disclose to any Principal any facts it may now or hereafter know regarding Borrower regardless of whether Lender has reason to believe that any such facts materially increase the risk beyond that which any Principal intends to assume or has reason to believe that such facts are unknown to any Principal, each Principal acknowledging that it is fully responsible for

being and keeping informed of the financial condition and affairs of Borrower;

(e)     Lack of notice of default, demand of performance or notice of acceleration to Borrower, any other person or entity with respect to the Loan or the Retained Liabilities;

(f)     The consideration for this Limited Joinder;

(g)     Any acts or omissions of Lender which vary, increase or decrease the risk on any Principal;

(h)     Any statute of limitations affecting the liability of any Principal hereunder, the liability of Borrower or any guarantor under the Loan Documents, or the enforcement hereof, to the extent permitted by law;

(i)     The application by Borrower of the proceeds of the Loan for purposes other than the purposes represented by Borrower to Lender or intended or understood by Lender or any Principal;

(j)     An election of remedies by Lender, including any election to proceed against any collateral by judicial or non-judicial foreclosure, whether real property or personal property, or by deed in lieu thereof, and whether or not every aspect of any foreclosure sale is commercially reasonable, and whether or not any such election of remedies destroys or otherwise impairs the subrogation rights of any Principal or the rights of any Principal to proceed against Borrower or any guarantor for reimbursement, or both;

(k)     Any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other aspects more burdensome than that of a Principal;

(l)     Any rights to enforce any remedy which Lender may have against Borrower, any rights to participate in any security for the Loan and any rights of indemnity, reimbursement, contribution or subrogation which any Principal may have against Borrower or any other Principal or person;

(m)     Lender's election, in any proceeding instituted under the Federal Bankruptcy Code, of the application of Section 1111(b)(2) of the Federal Bankruptcy Code or any successor statute; and

(n)     Any borrowing or any grant of a security interest under Section 364 of the Federal Bankruptcy Code.

3.     **Consents and Releases.** Each Principal hereby consents and agrees that Lender may at any time, and from time to time, without notice to or further consent from any Principal and either with or without consideration do any one or more of the following, all without affecting the agreements contained herein or the liability of any Principal for the Retained

account, securing the Loan or the Retained Liabilities; (b) modify the terms of any document evidencing, securing or setting forth the terms of the Loan; (c) grant releases, compromises and indulgences with respect to the Loan or the Retained Liabilities or any persons or entities now or hereafter liable thereon; (d) take or fail to take any action of any type whatsoever with respect to the Loan or the Retained Liabilities; (e) enforce this Limited Joinder in separate actions against one or more of the Principals, or by an action against some or all of the Principals, or any combination of the foregoing; or (f) release any other Principal hereunder. To the maximum extent permitted by law, each Principal knowingly, voluntarily and intentionally agrees to be bound, just as Borrower is bound, by the provisions of Article 3 of the Loan Agreement (solely with respect to providing financial information with respect to himself), Section 4.2(k) of the Loan Agreement and Article 11 of the Loan Agreement, including, without limitation, the waiver of the right to a trial by jury in Section 11.2, and the consents to jurisdiction and the governing law of Illinois set forth in Sections 11.3, and 11.4, respectively.

Executed as of February 14, 20 05.

**PRINCIPALS:**

Name: William Obeid
Address: _____

Tax I.D. #: _____

Name: Christopher LaMack
Address: 142 PRESERVE WAY
MOORESVILLE, NC 28117
Tax I.D. #: 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

Name: Dante Massaro
Address: 12829 Shanley Ct.
Huntersville NC 28078
Tax I.D. #: 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

Name: Atit Jariwala
Address: _____

Tax I.D. #: _____

55

account, securing the Loan or the Retained Liabilities; (b) modify the terms of any document evidencing, securing or setting forth the terms of the Loan; (c) grant releases, compromises and indulgences with respect to the Loan or the Retained Liabilities or any persons or entities now or hereafter liable thereon; (d) take or fail to take any action of any type whatsoever with respect to the Loan or the Retained Liabilities; (e) enforce this Limited Joinder in separate actions against one or more of the Principals, or by an action against some or all of the Principals, or any combination of the foregoing; or (f) release any other Principal hereunder. To the maximum extent permitted by law, each Principal knowingly, voluntarily and intentionally agrees to be bound, just as Borrower is bound, by the provisions of Article 3 of the Loan Agreement (solely with respect to providing financial information with respect to himself), Section 4.2(k) of the Loan Agreement and Article 11 of the Loan Agreement, including, without limitation, the waiver of the right to a trial by jury in Section 11.2, and the consents to jurisdiction and the governing law of Illinois set forth in Sections 11.3, and 11.4, respectively.

Executed as of _____, 20_____.

PRINCIPALS:

Name:   William Obeid
Address: _____
_____
Tax I.D. #:_____


Name:   Christopher LaMack
Address: _____
_____
Tax I.D. #:_____


Name:   Dante Massaro
Address: _____
_____
Tax I.D. #:_____

Name:   Atit Jariwala
Address: _____
_____
Tax I.D. #:_____

55

## EXHIBIT A

Legal Description of Land

All those certain lots, pieces or parcels of land lying, situate and being in the Town of Youngsville, Franklin County, North Carolina and being known, numbered and designated as **"LOT 1 (1.984 acres), LOT 2 (0.881 acres), LOT 3 (1.826 acres), LOT 4 (7.295 acres) and LOT 5 (12.638 acres)"** as shown on that certain plat entitled **"Recombination for Gemini Acquisition Company"** dated February 9, 2007, prepared by Cawthorne, Moss & Panciera, P.C., which said plat is duly recorded in the Register of Deeds Office of Franklin County, North Carolina, in Map Book _____ at Page _____.

A-1

## EXHIBIT B

Construction Budget
(see attached)

B-1

Youngsville Crossing - Youngsville, NC
Total Project - Construction Budget

B-2

<u>**EXHIBIT C**</u>

Construction Completion Schedule

**Youngsville Crossings Bullet Point Schedule**
02.14.07

<u>**Youngsville Crossing**</u>

| | |
|---|---|
| CD's out for Bid | Jan. 22, 07 |
| Bids back from bidders | Feb, 06, 07 |
| Award Contract | Feb. 14, 07 |
| Mobilize | Feb. 19, 07 |
| Clear Site | Mar. 16, 07 |
| Certified Pad – Food Lion | Mar. 23, 07 |
| Certified Pad – Shops | April 01, 07 |
| Footing date – Food Lion | April 16, 07 |
| Footing date – Shops | May 22, 07 |
| Substantial Completion – FL | Oct. 22, 07 |
| Subs. Completion – Shops | Sept. 24, 07 |
| Food Lion Grand Opening | Nov. 14, 07 |

BOI 15806693.8 / 37050-000001

**EXHIBIT D**

Projected Net Proceeds

**Youngsville Crossing – Youngsville, NC**

*Outparcel Sales*

| Parcel Sale | Square Feet | Acres | Sale Price PSF | Total Sale Price | Commission | Additional Closing Costs | Net Proceeds |
|---|---|---|---|---|---|---|---|
| Outparcel 1 (CVS/Walgreens) | 84,942 | 1.95 | 18.50 | $1,200,000 | 6% | 1% | $1,116,0 |
| Outparcel 2 | 36,155 | 0.83 | 14.50 | 524,245 | 6% | 1% | $487,54 |
| Outparcel 3 (AutoZone) | 34,848 | 0.80 | 14.50 | 505,296 | 6% | 1% | $469,92 |
| Outparcel 4 | 44,867 | 1.03 | 14.50 | 650,569 | 6% | 1% | $605,02 |
| Outparcel 5 (Bank) | 57,935 | 1.33 | 14.40 | 834,264 | 6% | 1% | $775,86 |
| Outparcel 6 | 60,113 | 1.38 | 12.00 | 721,356 | 6% | 1% | $670,8 |
| Outparcel 7 | 179,032 | 4.11 | 9.00 | 1,611,284 | 6% | 1% | $1,498,4 |
| **Total Parcel Sale** | 497,891 | 11.43 | $12.89 | $6,047,014 | | | $5,623,7 |

D-1

BOI 15806693.8 / 37050-000001

## EXHIBIT E

Insurance Requirements

1. Carrier must be rated A-VII or better  (by A.M. Best)
2. Borrower must provide MLC insurance consultant with annual premium for the coverages shown and a list of premiums that remain unpaid for the term of the applicable policy.
3. If any policy provides coverage for multiple locations or entities, then the following additional requirements shall apply:  (A) Borrower must provide to MLC insurance consultant, prior to closing and prior to each policy renewal, a breakdown of coverages per location (if applicable) and a breakdown of premium allocations per location; (B) all premiums in respect of casualty coverages shall be allocated based upon then prevailing standards in the industry; (C) all premiums in respect of liability coverages shall be allocated in accordance with an allocation model which will objectively allocate the premium cost to each location based upon the rating supplied by the insurer's underwriters, and (D) blanket policy shall provide coverage in an amount and scope which is at least equal to what would be provided if the required coverage was purchased on an individual basis.
4. All references to MLC in the certificates and the policies shall be spelled out in full, not with abbreviations.  Insurance Consultant shall provide Borrower's insurance representative with MLC's correct legal name. (See below)
5. Insurance Consultant shall provide Borrower's insurance representative with MLC's correct address for inclusion on certificates of insurance and insurance policies. (See below)
6. Applicable Acord must provide 30 days (10 days for non-payment) notice of cancellation or any material change in the policy to Merrill Lynch Capital, and must delete "endeavor to" and "but failure to mail such notice shall impose no obligation or liability of any kind upon the company, its agents or representatives" language.
7. Deductibles for all coverages shall be no more than $25,000.00 or no greater than any amount specified by MLC insurance consultant or in the specific requirements set forth below.

8. Higher limits and special coverages in addition to those indicated may be required depending upon the nature of operations (property size, liability profile, loss history, etc.).
9. These Minimum Insurance Requirements are effective as of the Closing Date.  MLC reserves the absolute right to modify, amend or supplement these requirements at any time and from time to time during the term of the Loan and Borrower will be required to satisfy any such modified, amended or supplemented requirements after commercially reasonable notice to Borrower from MLC of such modification, amendment or supplement.

### CERTIFICATE HOLDER AND ENTITY TO BE SHOWN ON REQUIRED ENDORSEMENTS:

Merrill Lynch Capital,
a Division of Merrill Lynch Business Financial Services Inc.,
and its successors and assigns
c/o AON Risk Services
1000 N. Milwaukee Avenue
Glenview, IL 60025
Attn: MLC Real Estate

E-1

## REAL PROPERTY INSURANCE
### (APPLICABLE TO ALL PROPERTIES EXCEPT WHEN BUILDER'S RISK IS REQUIRED TO BE IN PLACE)

1. Coverage shall be evidenced by Acord 28 form (Evidence of Insurance), signed by authorized agent. Acord must evidence compliance with these insurance requirements.
2. Must be an all risk/special perils coverage form (including, without limitation, fire and extended coverage and collapse of the improvements)
3. Must provide for no coinsurance, or must provide agreed amount endorsement to suspend the application of any coinsurance provision. If coinsurance is suspended via agreed amount endorsement, agreed amount must be annually reevaluated and approved by MLC insurance consultant.
4. Must reflect building coverage greater than or equal to replacement cost valued by MLC without taking into account any depreciation (if blanket limit or loss limit is indicated on the policy, declared building value must be shown on the evidence of insurance). Renewal amount shall be adjusted by Borrower, subject to MLC insurance consultant's approval, to maintain proper insurable values.
5. **For properties primarily occupied by borrower:**  Must provide (A) 12 months business interruption and contingent business interruption coverage in a limit at least equal to 12 months fixed expenses and gross profits, as valued by MLC, (B) a 360 day extended period of indemnity and (C) extra expense coverage.  Business interruption/extra expense must be written without coinsurance or must be subject to an Agreed Amount endorsement. Use of a monthly period of indemnity will not be permitted.
6. **For properties primarily occupied by third party tenants:**  Must provide 12 months loss of rents coverage in a limit at least equal to 12 months rental income as valued by MLC. Use of tenant's business interruption insurance does not satisfy this requirement unless the property is leased to a single tenant and the tenant is contractually obligated to continue rent payments without abatement for the period of reconstruction.
7. Must provide boiler & machinery (equipment breakdown) coverage in amounts consistent with industry standards and approved by MLC insurance consultant.
8. Must provide building Law and Ordinance coverage.  Must reflect coverage equal to minimum of 5% of replacement value for demolition and 20% of replacement value for building ordinance/increased cost of construction.
9. **For all locations in first tier coastal counties in North Carolina, South Carolina, Georgia, Alabama, Mississippi, Louisiana, Texas, Hawaii and the entire state of Florida:**  Must provide windstorm/hail coverage.  Coverage amounts shall be equal to the building replacement value, with deductibles of up to 5% of the replacement value at each location.
10. **For properties in FEMA flood zones A, B, V, and X-Shaded:**  Must provide flood coverage in the maximum amount available under FEMA's flood insurance plans. MLC may require additional flood coverage beyond the FEMA amounts in its discretion.
11. **For properties located in Seismic Zones 3 and 4:**  Must provide earthquake coverage, if applicable.  Coverage amounts shall be equal to fifty percent (50%) of the building replacement value, with deductibles of up to 5% of the coverage amount at each location. MLC may require higher earthquake coverage in its discretion.
12. **For hotel properties only:**  Must provide bailee coverage covering property in insured's

E-2

care, custody, and control.  Must provide broad form Crime Insurance insuring against the loss of hotel and/or guest property due to criminal actions.  Coverage amounts must be consistent with industry standards and in amounts approved by MLC insurance consultant.

10. Must provide for insurer's waiver of subrogation as to any insured claim for which insured has waived the right of recovery prior to the loss (including for claims against tenants of the property) [this requirement not applicable if landlord and tenant are ,affiliated and insured under the same casualty policy]

11. Must provide for no terrorism exclusion unless approved by MLC insurance consultant

12. MLC shall be included as Mortgagee and Lenders Loss Payee and Additional Interest

## GENERAL LIABILITY

1. Shall be evidenced by Acord 25 form (Certificate of Insurance), signed by authorized agent
2. Coverage must be provided on an occurrence basis Commercial General Liability form
3. Policy limit shall be no less than $1,000,000 per occurrence ($2,000,000 in the case of hotel properties), $3,000,000 in the aggregate (primary and umbrella/excess can be combined to achieve minimum limit).  Additional excess/umbrella liability coverage shall be required in amounts, if any, consistent with industry standards.
4. **For hotel properties only:**  Must provide coverage for Liquor Liability if restaurants, bars, and/or room service provides the sale of alcoholic beverages.  Must provide waterborne and watercraft coverage if hotel is on a waterfront and/or provides boating and/or marina services.  Coverage amounts must be consistent with industry standards and in amounts approved by MLC insurance consultant.
5. MLC must be included as Additional Insured

## AUTOMOBILE LIABILITY (if applicable)

1. Shall be evidenced by Acord 25 form (Certificate of Insurance), signed by authorized agent
2. Must provide business auto policy form coverage for Owned, Non-Owned, and Hired autos
3. Must provide minimum of $1,000,000 per occurrence limit (primary and umbrella/excess can be combined to achieve minimum limit).
4. **For hotel properties only:**  must provide Garagekeepers Legal Liability. Coverage amounts must be consistent with industry standards and in amounts approved by MLC insurance consultant.

## WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY
## (APPLICABLE ONLY TO (A) HOTEL PROPERTIES AND
## (B) GENERAL CONTRACTOR FOR ALL CONSTRUCTION LOANS)

1. Shall be evidenced by Acord 25 form (Certificate of Insurance), signed by authorized agent
2. Must provide Statutory Workers' Compensation
3. Employer's Liability coverage in an amount acceptable to MLC insurance consultant and consistent with the general liability limit.

## PROFESSIONAL LIABILITY
## (APPLICABLE ONLY TO HOTEL PROPERTIES)
E-3